**Pamela and Richard PYKA, individually and as administrators of the Estate of Christian Pyka, deceased, and Danielle Pyka, individually, Plaintiffs,**

v.

**The VILLAGE OF ORLAND PARK, and Chief Charles Rabideau, Police Officers Timothy McCarthy, Michael Loewe, Patrick Duggan, Jeffrey Cavender, Sgt. Charles Doll and Sgt. Kenneth Slewoski, individually and in their official capacities, Defendants.**

No. 92–C–7888.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 8, 1995.

Sheldon Lee Banks, Law Office of Sheldon
L. Banks, Chicago, IL, Joseph Vincent Rod-
dy, Law Office of Joseph V. Roddy, Chicago,
IL, for Pamela Pyka, Richard Pyka, individu-
ally, and as administrators of the Estate of

Christian Pyka, deceased est Christian Pyka, Danielle Pyka, individually.

Eugene Kenneth Friker, Richard T. Wimmer, Dennis G. Walsh, James Vincent Ferolo, Klein, Thorpe & Jenkins, Ltd., Chicago, IL, for Village of Orland Park, Charles Rabideau, Chief, Timothy McCarthy, Michael Loewe, Patrick Duggan, Robert M. Piantanesi, Jeffrey Cavender, Michael Muller, Donald Hartsock, Police Officers, Charles Doll, Kenneth Slewoski, Sgts., Thomas Lynch, Individually, James Dowling, III, John Mattes, Commanders, William Gaides, Christina Leach, Phyllis Krisik, Dispatchers, individually and in their official capacities.

## TABLE OF CONTENTS

I. BACKGROUND ...................................................1203

 A. The Evidence ...............................................1203
 1. Autobiographical Information .........................1203
 2. The Accident ........................................1203
 (a) Lyle Healy's Version .........................1203
 (b) Officer McCarthy's Version....................1204
 (c) Officer Loewe's Version......................1204
 (d) Officer Duggan's Version......................1205
 3. Events In The Lock–Up ...............................1205
 (a) Lyle Healy's Version .........................1205
 (b) Officer McCarthy's Version....................1206
 (c) Officer Loewe's Version......................1207
 4. Events In The Cell Block ............................1207
 (a) Officer McCarthy's Version....................1207
 (b) Officer Loewe's Version......................1208
 (c) Telecommunications Officers' Versions .........1208
 (i) Officer Bill Gaides .........................1208
 (ii) Patricia Kowalski .........................1209
 5. Eyewitness Testimony ................................1209
 (a) Officer Piatanesi's Report ....................1209
 (b) Detainee Padin's Statement ...................1210
 (c) Officer Hartsock's Testimony .................1210
 (d) Sgt. Doll's Testimony .........................1210
 (e) Paramedic's Testimony .........................1211
 6. Expert Testimony ...................................1211
 7. Autopsy Report .....................................1211
 8. The Videotape ......................................1212
 (a) Booking Process & Field Sobriety Tests ........1212
 (b) The Take–Down................................1212
 (c) Post–Take–Down Occurrences .................1213
 (d) Events At Time of Pyka's Death ..............1214

II. DISCUSSION ...................................................1214

 A. Summary Judgment Standards ...............................1214
 B. Analysis ..................................................1214
 1. Count I: Excessive Force ............................1215
 (a) Qualified Immunity ...........................1215
 (i) Scope of Discretionary Authority ...........1216
 (ii) Constitutional Violation ...................1217
 (iii) Clearly Established Law....................1219
 (b) A Split of Authority ..........................1219
 (i) The Circuit Court Decisions ...............1219
 (ii) The District Court Decisions ..............1220
 (iii) The Suicide Cases ........................1222
 (iv) Seventh Circuit Law .......................1222
 (c) The Merits ...................................1223
 (i) Officer McCarthy ...........................1225

 (ii) Officer Loewe ..........................................1226
2. Count II: Refusal of Bail ..........................................1227
3. Count III: Punishment..........................................1228
4. Count IV: Failure To Provide Medical Care ........................1230
5. Count V: Municipal Liability ..............................1230
6. Proximate Cause..........................................1231
7. Motion for Judgment on The Pleadings............................1232

III. CONCLUSION..................................................1233

*MEMORANDUM OPINION AND ORDER*

CASTILLO, Judge.

On November 8, 1991, four years ago today, Christian Pyka ("Pyka"), an eighteen-year old youth in police custody, committed suicide by hanging himself from the bars of his cell with his t-shirt. Pyka's parents, the representatives of his estate, and his sister Danielle (collectively the "plaintiffs"), have brought this tragic civil rights case [1] pursuant to 42 U.S.C. §§ 1983 and 1988, against the Village of Orland Park (the "Village") and various police officers [2] (collectively the "defendants"), in their individual and official capacities, who were involved in the events of that night.[3]

Pyka's death leaves many questions unanswered—answers that unfortunately only Pyka, himself, could have provided. Thus, most of these questions are destined to remain unanswered no matter how this lawsuit is ultimately resolved. The only clues to Pyka's mysterious death are the statements of the police personnel on duty, Pyka's friend, Lyle Healy, and Joseph A. Padin, a detainee housed in the cell next to Pyka's on the night Pyka died. There is also a video-tape of the events that occurred at the station before Pyka was taken to his cell.[4]

This evidence is highly circumstantial, largely disputed and, for the most part, inconclusive. Competing inferences can therefore be drawn from the material facts. To the extent that the facts are undisputed, reference to the Rule 12(M) and (N)(3)(b) Statements will be made.

---

1. This case was assigned to the Court's calendar on May 13, 1994, by order of the Executive Committee, from the calendar of the Honorable Wayne R. Andersen. On August 12, 1993, Judge Andersen dismissed a claim involving a § 1985 claim for conspiracy, and several supplemental state-law claims. On March 1, 1994, Judge Andersen entered a minute order dismissing defendants Piatanesi, Muller, Hartsock, Lynch, Dowling, Mattes, Gaides, Leach and Krisik from this case. By oral ruling, made in court on April 13, 1994, Judge Andersen denied plaintiffs' Motion to Strike the defendants' Affirmative Defenses, namely, for qualified immunity. *See Joint Status Report* at 2–3.

2. In particular the individuals named in the Amended Complaint (and their roles on the night of Pyka's death) are: **Chief Charles Rabideau; Sgt. Kenneth Slewoski** (*watch commander until 12 midnight* ); **Sgt. Charles Doll** (*fourth officer to arrive at cell after suicide; watch commander from 12 midnight on* ); **Timothy McCarthy** (*arresting officer of Pyka* ); **Michael Loewe** (*processed Healy and on scene with McCarthy during arrest and lock-up processing; helped McCarthy cuff Pyka, lead him into cell, remove his property and lock him up* ); **Patrick Duggan** (*first officer to arrive at scene of accident; second officer to arrive at cell after suicide* ); and **Jeff Cavender** (*third officer to arrive at cell after suicide* ).

3. In particular, the plaintiffs allege that the defendants violated Pyka's Fourth, Eighth and Fourteenth Amendment rights, namely, Pyka's right to be free from excessive force (Count I); to make bail (Count II); to be free from punishment as a pre-trial detainee (Count III); and to adequate medical attention (Count IV). In addition, the plaintiffs claim that Pyka died because the Village failed to train its officers in suicide awareness, among other things (Count V). There is also an untitled claim for survivorship benefits asserted against all defendants (Count VI).

4. Although the videotape supplies some objective evidence, the audio is virtually undiscernible and the visual quality of the tape is also lacking. The defendants are ordered to improve the quality of this tape, using all known technical means, and prepare a transcript of this tape so that the trier of fact may not only observe the events in the lock-up but also hear the words spoken by Pyka, Healy and the officers in the room. The defendants also not only need to provide some explanation for the fact that there are 6 minutes missing from the videotape between the time when Officer Hartsock made a call for help and the paramedics arrived with the stretcher, but also need to explain why the audio stops at 11:18:14 p.m.

## I. BACKGROUND

### A. The Evidence [5]

The parties present strikingly different versions of the events that occurred on the night of November 8, 1991, in their depositions and in the other exhibits submitted to the court. This evidence is summarized below. We begin with some autobiographical data.

### 1. Autobiographical Information

On November 8, 1991, Officer Timothy McCarthy, a former staff sergeant in the U.S. Army from 1967–1970 and a Vietnam Veteran with several commendations, worked in the Orland Park Police Department's traffic division as an accident reconstructionist. McCarthy Dep. at 5–6. At the time of the accident, Officer McCarthy was approximately six foot two inches tall, about 210–215 pounds and testified that he was in fairly good shape. *Id.* at 7. He also had completed several years of college and graduated from the police academy. *Id.* at 6.

Conversely, on the night he died, Christian Pyka was 18 years old, about five foot five and approximately 117 pounds. Teas' Autopsy Report, Pls.' Ex. D; McCarthy Dep. at 7 (putting Pyka at about 140–150 pounds). Pyka also had been taking classes at Moraine Valley Community College and "talking about getting more serious and going full time that evening. . . ." Healy Dep. at 10. Pyka, the son of divorced parents, Pamela and Richard Pyka, had one sister, Danielle, and was well-liked by his friends. P. Pyka's Dep. at 39–40. There is no evidence by anyone who knew Pyka that he had ever mentioned the desire to commit suicide; nor is there evidence that he had been troubled before his death. Healy Dep. at 9–10; P. Pyka Dep. at 41–42.

Lyle Healy, one of Pyka's closest friends, was with Pyka on the night he died. Healy was several years older than Pyka, Healy Dep. at 7, and when asked to describe the basis for the friendship, stated: "we were

close. . . . Probably hung around almost on a daily basis as kind of like—not necessarily a big brother, little brother thing, but it was kind of like I watched out for him a little bit." *Id.*

### 2. The Accident

#### (a) Lyle Healy's Version

Lyle Healy was with Pyka on the night he died, riding as a passenger in the Chevy Blazer Pyka was driving. *Id.* at 21. Healy testified that it was a cold and icy night. *Id.* at 18. As they were driving to a friend's house, they hit a large patch of ice and began sliding toward the intersection. Healy Dep. Exh. 1 at 1. When the Blazer hit a thawed-out area in the street, the car slid to the other side of the street, hit the curb and tipped the Blazer onto its passenger side. *Id.* Healy testified that Pyka had his seat belt on, and when he released the belt to free himself from his seat, he fell onto Healy. *Id.* The two then exited the Blazer through the driver side door. *Id.* After the car turned on its side, Healy checked Pyka for injuries and "found absolutely no cuts, abrasions or bruises on Chris, whatsoever, . . ." *Id.* at 2.

While Healy and Pyka were checking each other for injuries, two of their friends, Tom Hum and Oscar Thorson, drove up in Thorson's car. In a statement prepared the day after the accident, Healy describes the rest of the scene as follows:

> After we explained what happened, Oscar, Tom and I attempted to tip the Blazer back over. Because of the weight of the vehicle and the ice under our feet, we were unable to move the vehicle much. As we stood there talking about what we were going to do after we took care of everything with the Blazer, Officer Duggan pulled up. Officer Duggan asked who was involved in the incident and Chris and I informed him that we were the only two. Officer Duggan then told Oscar and Tom to get in their car and leave. As that was

---

5. Although the parties present a skeletal framework of undisputed facts, we recount the events of November 8, 1991, as revealed by the testimony and exhibits in the record and the Court's own viewing of the videotape, to provide a complete picture of the evidence in this case and a context for our analysis. Although many of the facts provided in this section of the opinion are disputed, they provide the basis for this Court's decision to send the case to trial.

happening, all the other squads started pulling up along with an ambulance, tow truck and fire engine. A couple officers asked if we were the ones involved in the accident. When we said that we were, they called the paramedics over. The paramedics asked us to come in the ambulance with them to fill out waivers. As we were about to follow them, one of the officers asked who was driving, Chris said he was. The officer then grabbed Chris by the arm and took him into the group of officers by their squads. I went into the ambulance and filled out my waiver for medical attention. When I got out of the ambulance an officer told me to follow him for questioning. As I was following him I saw that Chris was up against a squad car, getting arrested. When I asked why he was getting arrested, Officer McCarthy said, "I'll think of something." The one officer then proceeded to lead me to Officer Loewe's squad and put me in the back seat. After several officers questioned me through the open window, they told me that they were taking Chris to the station and, after taking care of a few more things, they were taking me there too. I asked if I was getting arrested and they said "no." Officer Loewe then got into the squad and left for the station. On the way to the station, Officer Loewe asked me many questions and informed me of his blatant dislike of Palos Heights kids that they were spoiled punks, who's parents always got them out of everything. He also asked if we had been drinking. I told him that I didn't think Chris had anything to drink, but I had a few shots of Whiskey before Chris got to my house.

*Id.* at 3. At the time of the accident, Healy believes that Pyka was wearing jeans, a sweater and a jacket. Healy Dep. at 19.

### (b) Officer McCarthy's Version

At about 9:00 p.m., on November 8, 1991, Orland Park Police Officer Timothy McCarthy arrived at the scene. 12(M) ¶ II.A.4. Officer Duggan approached Officer McCarthy and advised him that the Blazer had crashed; there were two subjects inside the vehicle who were out of the vehicle; and the driver had been Christian Pyka. McCarthy

Dep. at 22. McCarthy then approached Pyka, who was leaning against the back of a squad car. *Id.* Pyka immediately volunteered that he was the driver. *Id.* In McCarthy's words, "[w]hen Pyka was identified as the driver ... there was a separation. I took Pyka away from Healy." McCarthy Dep. at 23.

Officer McCarthy then "took control of the accident." 12(M) ¶ I–A (1–4); McCarthy Dep. at 13. McCarthy checked Pyka for injuries at the scene and found that Pyka had no apparent bruises on his body, facial or otherwise. 12(N)(3)(b) ¶ I–A (1). *But see* McCarthy Dep. at 91 (where he subsequently remembered seeing an abrasion on his forehead that he attributed to the accident). McCarthy then began to interview Pyka, who he observed was "suffering from the influence, ... of alcohol or some substance." *Id.* at 25. McCarthy claims that a confrontation with Pyka began when McCarthy asked Pyka for his drivers' license. *Id.* at 35–36. When Pyka refused to give McCarthy the license or his name, McCarthy Dep. at 35, and began to talk loudly and say obscene things, McCarthy Dep. at 27–34, McCarthy placed Pyka in handcuffs and put him in the back of his squad car. *Id.*; 12(M) ¶ II.A.8. McCarthy decided to arrest Pyka because he believed that Pyka had been driving while intoxicated. *Id.* at 26–27; 12(M) ¶ II.A.7. McCarthy also stated: "in my opinion he [Pyka] understood completely what was going on ... he knew exactly what I was asking him." *Id.* at 34–35.

Following the investigation at the rollover scene, Healy and Pyka were transported to the Orland Park Police Department, 12(M) ¶ I–A (5), in separate cars. Loewe Dep. at 18; McCarthy Dep. at 23, 36. Pyka was with McCarthy, and Healy was with Loewe. *Id.* McCarthy testified that it took approximately 5 minutes to drive Pyka from the scene of the accident to the police station. McCarthy Dep. at 29; 12(M) ¶ II.A.12.

### (c) Officer Loewe's Version

On November 8, 1991, Officer Michael Loewe also arrived at the scene of the accident. 12(M) ¶ II.A.4. The driver, later identified as Christian Pyka, was talking to Offi-

cer Duggan. Loewe Dep. at 15. Officer Loewe remembers that Officer McCarthy decided to arrest Pyka, handcuffed him, placed him in his squad car and transported him to the station. Loewe also remembers that someone determined that he would transport Healy, the passenger, to the police station. Loewe does not believe that Pyka resisted arrest, rather "[h]e pretty much just went along with...." it.[6] Loewe Dep. at 19.

### (d) Officer Duggan's Version

Officer Duggan recalls that he arrived at the scene of the accident first, 12(M) ¶ II.A.4, identified Christian Pyka as the driver and then conducted a preliminary investigation into the accident, finding no serious injuries. *Id.* When Officer McCarthy arrived, he advised him that the Blazer had crashed; there were two subjects inside the vehicle who were now out of the vehicle; and the driver had been the subject who was later identified as Christian Pyka. Duggan Dep. at 24; McCarthy Dep. at 22. Duggan then transferred the investigation to McCarthy. Duggan Dep. at 22. Although Officer McCarthy testified that Pyka was leaning against the back of Duggan's squad car when he arrived, Officer Duggan recalls that when Officer McCarthy arrived, he went to the rear of Duggan's squad car, opened the door and removed Pyka from the back seat. Duggan Dep. at 24. McCarthy then conducted a pat down of Pyka at Duggan's squad and cuffed him at that time to be placed in McCarthy's vehicle. *Id.* Duggan also remembers that Officer Loewe found some alcohol in the Blazer, Duggan Dep. at 20–21, and that he did not see Pyka resisting arrest. Duggan Dep. at 24–25.

### 3. Events In The Lock–Up

#### (a) Lyle Healy's Version

In a written statement, made on November 9, 1991, Lyle Healy testified that he observed the following events as he entered the lock-up the previous night.

When we got to the station, Officer Loewe and I walked through the parking garage and into the booking area. Officer McCar-

thy and Chris were already in the booking area alone. Officer McCarthy was having Chris walk a straight yellow line, that was placed directly parallel to a bench along the south wall, where Officer Loewe told me to sit. As I was watching, Chris walked the line twice with no error. Even Officer McCarthy said that Chris did well. The next test he was given was to hold one of his feet up and balance while counting to thirty aloud. Once again he did this perfectly. The two officers then told Chris to sit next to me on the bench because they had to wait a certain time limit to submit a breathalizer test. The whole time that we sat there and waited, Chris kept saying that we've got to hurry up and get out of there so that we could meet up with everyone and find out what they're doing. After the time limit had elapsed, the officers had Chris take the breathalizer test. When they came back with the results, Officer McCarthy told Chris that he had failed and blown a .11. At this point, he also informed Chris that he was arresting him for D.U.I. Chris then asked to make a phone call, when Chris got up and started dialing the phone, which was located on the large desk in the middle of the booking area, he and Officer Loewe started arguing and Chris gave him the middle finger. Then Officer Loewe threatened to break his finger off, so Chris did it again. When this happened, Officer McCarthy stood up right next to Chris and it looked like he was going to either grab Chris or take the phone away. So Chris took a step back and held the phone up away from the officer and yelled "Leave me alone, I'm talking to my mom!" so Officer McCarthy grabbed him and they started to struggle. As McCarthy put him in a chokehold, Officer Loewe grabbed the phone out of his hand and hung it up saying "Great! His mom was on the phone, now she probably thinks we're killing the kid." McCarthy held Chris in the chokehold for a while, then pulled him over to the south wall in front of me and knelt him down, put his

---

**6.** The rest of Loewe's sentence was not made available to the Court in the deposition pages provided by the parties. There are many instances where relevant and material information is not provided because the parties have omitted key deposition pages.

knee in the small of his back and held him there while Officer Loewe handcuffed him. They then exchanged words with him before standing him up and bringing him into the holding area. When they got into the cell I heard loud yelling and screaming back and forth. I recognized McCarthy's voice as saying "Don't fuck with me, just don't Fuck with!" I then heard a number of slapping sounds and Chris yelling, "come on cop, hit me again!" One of the officers came out and got another pair of handcuffs and brought them into the cell. Two more officers then came into the booking area as Officer McCarthy and Officer Loewe came out of the holding area. One of the two new officers went into the holding area for a short time and I heard the crunching of handcuffs. When he came out he said that he had given Chris one last good tightening. When McCarthy and Loewe came out, McCarthy came straight over to me sitting on the bench and got in my face and said that Chris was his own worst enemy and he's lucky that they don't kill him. The four officers then stood around for a while before McCarthy came back over to me and told me he was giving me a ticket but not to worry about it and that I could leave. I asked him about bailing Chris out and he said to bring his license and $100 or no license and $300.00. At that time Chris yelled for me to call his mom and yelled her work number. I wasn't able to hear the number so I asked Officer Loewe if I could go back there and ask Chris what it was. Officer Loewe said no and made up a phone number and told me I had to leave. As I was leaving Chris was yelling back and forth with another prisoner in the holding area. I went outside to find Oscar and Tom waiting for me.

In his deposition, taken nearly three years later, Healy testified that he observed substantially the same events when he arrived at the police station on the night of Pyka's death. When asked to describe the chokehold, Healy stated: "[McCarthy] came up, spun him around, and put his arm around his neck ... he was holding him a round-like one arm in front of his neck and one arm behind his neck like choking around his neck." *Id.* at 28–29. According to Healy, McCarthy and Loewe then "got him to the ground, they handcuffed him, they picked him up, they both kind of carried him over [to the cell area]. . . . I know it didn't seem like he was all that willing to go there, but he wasn't fighting or anything like that. He was pretty much subdued." *Id.* at 31. Healy then saw McCarthy and Loewe take Pyka into the cell area, *id.*, and Pyka said, "Lyle, call my mom" and "shouted the number" to him. *Id.* at 37. Healy then heard one of the officers say "you are not getting out of here tonight, kid." *Id.* Healy also said he heard (but could not see) "voices and slapping noises." *Id.* at 33. For instance, Healy recalls that McCarthy said, "don't fuck with me, you don't know what you got yourself into," and Pyka replied, "hit me again, cop, come on and hit me again." *Id.* at 32. According to Healy, McCarthy then "came out—enraged came out and ran up to me, got in my face, and said your friend is his own worst enemy and he is lucky we don't kill him." *Id.* at 61.

### (b) Officer McCarthy's Version

Officer McCarthy's version of the events of November 8, 1991, is as follows. McCarthy testified that when he arrived at the station with Pyka, he removed the handcuffs from Pyka's back, had him sit on a bench, and then cuffed one hand to the bench and began the paperwork necessary to process Pyka's arrest. McCarthy Dep. at 48. McCarthy then prepared a "probable cause to arrest" report. In the report, McCarthy indicated that Pyka was intoxicated, uncooperative, combative and abusive at the scene. 12(N)(3)(b) ¶ I–A (6). McCarthy then began to administer field sobriety tests. 12(M) ¶ II.A.14. McCarthy Dep. at 13. McCarthy testified that Pyka was joking around and not taking the tests seriously, *id.* at 56, so he sat Pyka down. *Id.* McCarthy reported that Pyka failed the tests because he did not follow the instructions McCarthy gave him. 12(M) ¶¶ II.A.13–14; 12(N)(3)(b) ¶ I.B.1. *Id.* at 59. The breathalyzer test was then given to Pyka, which he also failed. 12(N)(3)(b) ¶ I.B.1.

Pyka then asked to make a phone call and, according to McCarthy, was told "he could call as many people as he wanted." McCarthy Dep. at 63. McCarthy remembers that

when Pyka was on the phone with his mother he "started screaming into the phone and becoming more upset and excited and calling her a variety of names." McCarthy Dep. at 63. McCarthy was under the impression that his mother was yelling at him about being arrested. *Id.* McCarthy then testified that he "had seen enough of it ... went over to get the phone from [Pyka] to restore some calm," and then asked Pyka to give him the phone because the conversation was over. *Id.* "At that point he attempted to pull away, and I went again give me the phone, and he reared back with it, and that's when I jumped on him." *Id.* at 63–64. McCarthy further testified that, "when I took the phone or when I attempted to get the phone he was struggling with me until I took control of him. When I took control of him he calmed down. I laid him on the ground and I put my knee on his back and then I put the cuffs on him." *Id.* at 77; 12(M) ¶ II.A.17–18; 12(N) ¶ I.B.1. McCarthy testified that he does not believe that the handcuffs were put back onto Pyka's wrists too tightly. McCarthy at 78. McCarthy and Loewe then took Pyka back into the cell block and placed him in an empty cell. *Id.* at 78; 12(M) ¶ II.A.18.

### (c) Officer Loewe's Version

Officer Loewe also testified that he did not believe that the handcuffs were put back on to Pyka's wrists too tightly. Loewe Dep. at 80. Loewe's version of the lock-up events, however, does not match Officer McCarthy's in all respects. For instance, Officer Loewe testified that he gave McCarthy the evidence (alcohol) he found in the Blazer. Loewe Dep. at 26. Loewe also recalls seeing Pyka perform the field sobriety tests and observed Pyka fall off the line several times, while he "exaggerat[ed] his walk with a high step." *Id.* at 33. Loewe also testified that Pyka was "screaming and yelling" during the heel to toe test and as he sat on the bench, *id.* at 35, 38, and that Pyka gave McCarthy the finger while he was sitting on the bench. *Id.* at 41.

When Pyka finished the breathalyzer, Loewe remembers that Pyka asked to make a phone call and to bond out. *Id.* at 38. McCarthy then told Pyka that he would need $300 to bond out and could call someone to bring some money to the station. *Id.* When

Pyka approached the table to use the phone, he swore at McCarthy and dialed a number. *Id.* at 40. According to Loewe, Pyka "was yelling and screaming at McCarthy. He was yelling and screaming at the person on the phone. He was taking the phone from his ear back and forth to McCarthy yelling on the phone." *Id.* Loewe recalls that McCarthy advised Pyka "a couple times" to "Keep [his] mouth down." *Id.* Pyka, however, continued to yell, scream and "wave the phone around." *Id.* at 41. Loewe later clarified that "waving the phone around" meant that Pyka was taking the receiver from his mouth to talk to McCarthy and then placing it near his mouth to talk to the person on the other end of the phone. *Id.* at 42.

When Pyka did not respond to McCarthy's direction to stop screaming, McCarthy stood up, said "Okay, that's enough. Give me the phone." *Id.* at 44. McCarthy then walked to Pyka, who said "I'm not through yet." *Id.* McCarthy then grabbed for the phone. *Id.* Pyka "pulled the phone back up ... in a motion, it looked, to strike Timmy with the phone. It looked like he came forward." *Id.* According to Loewe, McCarthy then put both of his arms around Pyka to restrain him, and Loewe and McCarthy both grabbed Pyka's arm that held the phone. *Id.* at 47. Loewe then put the phone back on the hook. *Id.* Loewe remembers that Pyka was only in a restrained position for "seconds." *Id.* McCarthy then put Pyka on the floor and they cuffed him. According to Loewe, Pyka was resisting getting placed into handcuffs and never stopped moving around. *Id.* at 49–50. He and McCarthy then escorted Pyka to his cell, where there was a "houseful of prisoners." *Id.*

### 4. Events In The Cell Block
#### (a) Officer McCarthy's Version

McCarthy testified that the following events occurred in the cell. Pyka was placed in the cell at about 10:00 p.m., on November 8, 1991. Defs.' Ex. E. The cell door was open. McCarthy Dep. at 82. McCarthy and Loewe entered the cell with Pyka. *Id.* McCarthy then "stood him [Pyka] inside the cell and ... removed his property from him[,]" McCarthy Dep. at 81, while he was

still in handcuffs. *Id.* at 82. McCarthy remembers removing the contents of Pyka's pockets, a belt, his shoes and a stud earring. *Id.* McCarthy then "controlled his movement on to the bed on his stomach, and at that time I told him that as soon as he calmed down we would complete the processing and he would be free to go bond." *Id.* McCarthy said that he did not leave the cell the first time until approximately 10:45 p.m. that evening. McCarthy Dep. at 82–83. He then left for 10 or 15 minutes, *id.* at 87, and returned to the cell to remove Pyka's handcuffs. *Id.* at 85. When asked whether he noticed any injury to Pyka's forehead while he was in the cell, McCarthy answered no. He then stated that he believed the abrasion came from the accident, although he had previously testified that he did not observe this injury at the scene. When questioned further, McCarthy remembered seeing the abrasion.[7] McCarthy Dep. at 91. McCarthy testified that he then spoke to Todd Sherman, a friend of Pyka's, at approximately 11:00 p.m., about bonding Pyka out of jail. Apparently Sherman, who was in Pyka's house looking for his driver's license, wanted McCarthy to go to Pyka's cell and ask him where it was. McCarthy refused, admitting that he said something to the effect that Pyka would sit in jail and rot. *Id.* at 96.

McCarthy then remembers speaking to Pyka's father, Richard Pyka, who called McCarthy after the conversation with Sherman. *Id.* at 96–97. Mr. Pyka had questions about the arrest. McCarthy explained that his son was acting up and was calming down in the cell so that he could be processed. In McCarthy's words, "I wasn't going to force Mr. Pyka to be processed nor was I going *to beat him* into being processed, so I thought it best that Mr. Pyka come about a half hour, 45 minutes later to pick his son up and not to come before then because he wouldn't be processed until the next crew came on." McCarthy Dep. at 97 (emphasis added). McCarthy then finished his paperwork,

which is the bond information sheet, about 11:15 p.m. or so, and then went off duty. *Id.* at 94. Before Pyka, McCarthy had never arrested a person who committed suicide while in detention. 12(M) ¶ II.B.15.

#### (b) Officer Loewe's Version

Loewe testified that the following events occurred in the cell. Once inside the cell, McCarthy had Pyka lay face down on the bed while Loewe removed Pyka's shoes. While Loewe was removing the shoes, Officer McCarthy "took the belt and his earring and some—everything off of him." Loewe Dep. at 63. Loewe further indicated that Pyka was not fully clothed, *id.* at 62,[8] when he left Pyka and McCarthy alone to get the keys to the cell. *Id.* at 64. Loewe testified, however, that he was gone for less than a minute. *Id.* After Loewe brought the key back, he and McCarthy left Pyka handcuffed in the cell, *id.* at 60, lying face down on the bed. McCarthy Dep. at 82. Loewe claims that he never returned to the cell, but went back on patrol about 10:10 or 10:15 p.m. *Id.* at 74.

#### (c) Telecommunications Officers' Versions

Once in the hallway leading to the individual cells, the movements of Pyka, McCarthy and Loewe were not visible to Healy but were monitored by a camera that flashed images and sounds to several telecommunication officers in the radio dispatch (telecommunications) room of the Orland Park Police Department. Pls.' Ex. C. On duty at the time Pyka was led to his cell were: Officers Bill Gaidis and Phyllis Krisik. *Id.* Also present was Patricia H. Kowalski, a student intern from St. Xavier College who was specializing in Industrial/Organization Psychology. *Id.*

#### (i) Officer Bill Gaides

Telecommunication Officer Bill Gaides made (or failed to make) the following observations that night. On November 9, 1991, Gaides recalls watching Pyka take field so-

---

7. The deposition transcript of McCarthy's testimony, offered by both sides, does not fully explain this important inconsistency.

8. There were, however, no follow-up questions to these answers, so it is not clear from the record whether only certain pieces of Pyka's clothing

were removed or whether all his clothing was removed. In the Court's view, the failure to clarify this point is unexplainable. Unfortunately, the failure to fully explore certain inconsistencies occurs too often in many of the depositions taken in this case.

briety tests in the lock-up area. Gaides Dep. at 35. He also recalls observing the telephone call take-down by Officer McCarthy. *Id.* At his deposition, however, Gaides did not recall observing Pyka's journey to his cell. *Id.* at 39. Similarly, Gaides did not observe the shoes, belt and unidentified other object(s) fly out of the cell, *id.* at 40, even though the statements he made to the special investigator immediately after Pyka's suicide indicate that Gaides looked at the cell area monitor and noticed that the driver's (Pyka's) shoes were thrown out of the cell. *Id.* at 48. At his deposition, Gaides also did not remember seeing McCarthy go back to the cell to uncuff Pyka or any other officer go to the cell to check on Pyka, *id.* at 40, until his memory was refreshed by the statements he made to the investigator. *Id.* at 49. For instance, in the investigative report, Gaides recalled that he saw "Officer McCarthy close the cell door at which time he turned down the volume of the audio monitor." *Id.* at 49. Gaides also said he "turned *down*" the monitor because he "was having a hard time hearing the patrol units on the street calling in." *Id.* Gaides does not recall hearing any screams for help or shouts for assistance coming from the cell area. 12(M) II.I.9. Gaides did not remember turning the audio on the monitor back up at some later point in time. *Id.* at 51.

### (ii) Patricia Kowalski

In an investigative report, Patricia Kowalski, a student intern who happened to be observing from the telecommunications room on the night Pyka died, stated that she observed the events in the police station from the time that Officer McCarthy and Pyka entered the lock-up until the time when Pyka was placed in his cell. In her opinion, Pyka appeared to be tense and angry, but Officer McCarthy maintained his professional reserve. In particular, she observed that when Pyka took a field sobriety test he started to high kick as a European soldier would do. Pls.' Ex. C. At that point, other radio transmissions came into the room, and Officer Gaides reached up and turned the volume *off* the camera. *Id.* However, during the altercation between McCarthy and Pyka concerning the phone, she observed that Officer Gaides turned *on* the audio volume. *Id.* According to Kowalski, Pyka sounded abusive. *Id.* Kowalski then observed both McCarthy and Loewe escort Pyka to a cell. *Id.*

When Pyka and the officers entered the cell, Kowalski observed the following events.

> Kowalski then saw one shoe, then another, tossed out of the cell and then an article of clothing was tossed out. Kowalski saw Officer McCarthy walk out of the cell with a dark colored belt and put it on the table, whereupon Gaides then turned the sound *off.* Shortly thereafter, Officer McCarthy came into the radio room. Kowalski tried to talk to Officer McCarthy but Officer McCarthy was very serious.... McCarthy seemed visually shaken by the incident.... Kowalski remembers Office[r] McCarthy saying in a rather resigned fashion, he's (PYKA) lying in his (PYKA's) cell and crying now. Officer McCarthy then left the radio room without saying another word.

Pls.' Ex. C.

### 5. *Eyewitness Testimony*

#### (a) Officer Piatanesi's Report

Officer Piatanesi told the investigating officer that he arrived at the Orland Park Police Department at approximately 10:50 p.m. At approximately 11:20 p.m., after finishing a report, Sgt. Slewoski asked him to check the prisoners. 12(M) ¶ I.C.6. According to Officer Piatanesi, he went to the male side of the lock-up and looked at the cards, noting that there were three prisoners. Aff. of Piatanesi at 2. Officer Piatanesi then physically looked at each prisoner, noting the following: in the first cell, a male Hispanic was laying on his back and looked up at him; in the second cell, a male Hispanic [was] laying on his side, who also looked up at him; and in the third cell, the male white was lying on his stomach facing out at the bars with his hands at his sides and his shirt draped over his head. *Id.* The male white picked up his head, looked at Officer Piatanesi, and laid his head back down. *Id.* Officer Piatanesi then returned to the card rack, signed the cards, and left the area, returning to patrol. Pls.' Ex. A.

### (b) Detainee Padin's Statement

A prisoner housed in the cell next to Pyka's recounts a similar story.

> The kid was escorted to the cell by arresting officer and three other officers. The kid was still cuffed. The kid was placed in the cell. Again words were exchanged. A little push on the kid, because of his behavior, but the kid was not beaten. Please take note of that, I seen and heard what happened in the lock-up. The kid was scared and he felt as if someone was going to hurt him. He said to me, "Sir, you don't know what goes on here. I have lived in Orland Park all my life. The police here write their own law and book. This is Orland Parksville. If you don't live here, they will make sure that you never come back and, if you live here, they will make sure that you move after they arrest you. These racists police, yuppy bastards." After this, the officer came back, took off his belt, shoes and something else. The kid again stating, "Why don't you just kill me and get it over with?" The officers again left the cell and again the kid and I stayed talking to where the kid again kept saying that I was lucky that they didn't try to kill me. I then told him that no one was going to hurt him. Again an officer came to the cell and addressed me as 52, which meant the number of times that I had been arrested. The officer told me to share some of my wisdom with him. Let him know that no one would hurt him. Again, the officer left. The kid and I stayed talking. The kid then said that he didn't do anything wrong and he was locked up. Why didn't he just make it easy for the police, and kill himself. I then told him not to think like that. That he would be out of here in no time. Again, the officer that asked me to share my wisdom with him came back with another officer and *uncuffed* the kid. The kid then went off bitching about him getting a phone call. The officer told him to chill out, and allowed me to make a call because I had been there for ten hours without a call, and he (the kid) had just been there for over one hour. The officer said that he would come back to let him make a call in a few minutes. The kid and I stopped talking. After about ten minutes, I heard a gasping sound. I called for the kid and no answer. Again, I called and no answer to where I started calling for the lock-up police attendant. No one heard me. After about 20 or 25 minutes, an officer came to the back. I then told him that I have been trying to call him that I believe that the kid hurt himself. He looked in the kid's cell and found the kid hanging. The kid had taken his life on his own.

Pls.' Ex. B (emphasis in original).

### (c) Officer Hartsock's Testimony

Officer Hartsock found Pyka hanging from his cell bars at approximately 12 midnight on November 9, 1991. According to Hartsock, he "ran back to secure his weapon, ... called on [his] portable for assistance, for a supervisor, and ran back again and got the keys to the cell block." [9] Hartsock Dep. at 22. As Hartsock began to open the cell door, Officer Duggan entered the cell block and began to help Officer Hartsock untie the noose and lower Pyka's body. *Id.* at 24.

### (d) Sgt. Doll's Testimony

When Sgt. Doll responded to the radio transmission for help, he found two or three officers huddled inside and outside Pyka's cell. He remembers that Officer Cavender motioned for him to come down to the cell where Officer Hartsock was present. Doll Dep. at 17. The cell door was open and Pyka was still hanging from his cell bars. *Id.* Doll then checked his carotid pulse, started checking the radial pulse and sent somebody to notify the on-duty watch commander (Sgt. Slewoski) and summon the paramedics' assistance. *Id.* Doll found no pulse and determined that Pyka was ice cold. *Id.* at 18.[10] Doll then ordered someone to grab a camera,

---

**9.** The videotape shows that Officer Hartsock did not run but walked to the phone in the lock-up and walked again back into the lock-up. There is no indication that he secured his weapon.

**10.** Doll testified that he had seen more than ten additional suicides in the Orland Park Police Department. Doll Dep. at 18. He then stated that despite these occurrences, he had never received specialized training in suicide prevention. *Id.*

and he took pictures of Pyka while the t-shirt Pyka used as a noose was still around his neck. *Id.* Pyka was then taken down from the bars and placed down on the bed. *Id.* at 24. CPR was not attempted by any of the officers. 12(M) ¶ I.C.11.

### (e) Paramedic's Testimony

Lt. Steve Smith is a firefighter and was one of the paramedics who arrived at the police station on November 8, 1991. 12(M) ¶ II.J.1. The call to respond came about one minute after midnight on November 9, 1991. *Id.* at 2. Smith was told that there was a "DOA" at the department location. Upon his arrival, he found Pyka's body propped against the cell bars. *Id.* at 3. He immediately conducted five "rounds" of CPR breathing, but found no response. *Id.* at 4. At no time from the time of his arrival through the time he left Pyka at the hospital did he detect a pulse, blood pressure rate or respiratory count. *Id.* at 5. In reviewing his EMS report, he confirmed that he detected Pyka's body as having a "warm" temperature which he noted on the report. *Id.* at 6. It was Lt. Smith's opinion that Pyka was cyanotic ("bluish in color") when he arrived at the scene and that Pyka was in full cardiac arrest at the time. *Id.* at 7.

### 6. Expert Testimony

The testimony of various Orland Park Police Department personnel reveals that there was no effort by the Village of Orland Park to train its police officers or personnel with respect to suicide prevention or detection. 12(M) ¶ III.A. Plaintiff's expert, Joseph R. Rowan, concentrates in the area of suicide detection and prevention. 12(M) ¶ IV.A.1. Rowan testified that Pyka should have been strictly supervised because he was inebriated. *Id.* at 4. Although Orland Park Police Department General Order G89–8 requires officers to place inebriated persons in a cell which is subject to "strictest supervision," *id.* at 4, "strictest supervision" is not defined. According to Rowan, "strictest supervision" requires a police department to respond to a prisoner in need of medical treatment or CPR within four minutes of notification.

This standard is not applicable to or required by police departments in Illinois. *Id.*

Mr. Rowan further stated that Illinois does not have a standard which prevents audio monitors from being turned down by dispatchers. *Id.* at 10. In fact, Rowan acknowledged that the Illinois Jail and Municipal Lockup Standards do not require video monitoring at all. *Id.* at 9. Rowan also acknowledged that there is no statute, rule or regulation that requires Illinois local municipal law enforcement agencies or police officers to immediately administer CPR upon a body. *Id.* at 12. Defendants' expert, Thomas Walton, also agrees that there is no requirement that CPR be administered in a case like this one. Suppl. 12(M) ¶ II.A.2. Rowan further acknowledged that there is no statute or mandate that requires local law enforcement agencies to undertake suicide awareness training. *Id.* at 19. Thus, although Rowan indicated that Pyka displayed six or seven of the twenty plus "symptoms" which characterize suicidal tendencies, *id.* at 20, the police officers on duty when Pyka died were not responsible for recognizing these symptoms, absent some affirmative knowledge that Pyka was at risk. *Id.* at 24. Rowan also acknowledged that the only problem regarding medical treatment with respect to the hanging incident was the "failure to provide CPR." *Id.* at 6. For instance, medical services were offered to Pyka following the rollover car incident, but Pyka refused treatment. *Id.* at 7. Walton also testified that Pyka was not denied proper medical treatment at the rollover scene because he refused it. *Id.* at ¶ II.B.1.

### 7. Autopsy Report

Pyka's injuries at the time of death were recorded by the coroner, Dr. Shakus S. Teas, who performed an autopsy. In the autopsy report, Dr. Teas verified that Pyka weighed only 117 lbs., and noted that Pyka sustained multiple bruises and several wounds on the night of his death. For example, there was, among other injuries, a circumferential groove with abrasions;[11] a pinpoint area of

---

**11.** In the deposition of Dr. Teas, neither side submitted the pages that contain Dr. Teas' expla-

nation of this wound; instead the deposition stops short after the question is asked. The

abrasion on the left side of the forehead; a bruise on the right upper arm; an abrasion on the anterior aspect of the right wrist; a similar abrasion on the left wrist; multiple abrasions on the right flank, multiple small areas of petechiae on the right and left buttocks; multiple small areas of ecchymosis [12] on the anterior aspect of the right thigh; two parallel areas of superficial abrasion with an area of one inch in between them just below the abrasions on the right thigh; a linear area of superficial abrasion just above the right knee; a superficial abrasion on the anterior aspect of the right shin; a superficial abrasion on the medial aspect of the right foot; an abrasion on the anterior aspect of the left shin; and an area of ecchymosis on the dorsal aspect of the left foot. In his deposition, Dr. Teas explained that the small abrasion on Pyka's forehead was a recent injury. Teas Dep. at 36. The abrasions to the legs would have been caused by a blunt injury, for instance from a blow or a bump into a table. Teas Dep. at 52. Dr. Teas could not confirm the source of those injuries. *Id.* at 54.

### 8. The Videotape

Fortunately, in this case, there is a videotape of some of the events that took place in the lock-up on the night of November 8, 1991. Unfortunately, the audio on this video is virtually undiscernible and the visual acuity of the tape is extremely poor. There are also activities that cannot be seen given the angle of the camera in relation to the physical positions of the parties. This videotape, however, is objective evidence, establishing that the testimony of Lyle Healy and Officer McCarthy is fairly accurate, while the statements of Officer Loewe are not. The Court has viewed this tape at least seven times and made the following observations.

### (a) Booking Process & Field Sobriety Tests

The following chronological summary is an outline of the events that occurred in the lock-up on the night of November 8, 1991.

Time: **9:16 p.m.:** Officer McCarthy and Pyka enter the lock-up. Pyka takes off his coat and McCarthy then cuffs one of Pyka's hands to the bench on which he is sitting. McCarthy then spends approximately 10 minutes talking to Pyka.

Time: **9:18–31 p.m.:** McCarthy gives Pyka a series of field sobriety tests.

Time: **9:31 p.m.:** Healy enters the lock-up with Officer Loewe. Healy takes off his coat and sits on the bench where Pyka had previously been. Pyka and McCarthy then begin the heel-to-toe, straight line test. As Pyka walks the line, he begins to high-kick. McCarthy then directs Pyka to stand holding one leg off the ground.

Time: **9:34 p.m.:** McCarthy concludes the tests and Pyka is directed to sit at the other end of the bench.

Time: **9:34 to 9:41 p.m.:** The two officers merely talk and record notes. Healy and Pyka also talk. Healy freely gets up and goes to the bathroom during this seven minute period.

Time: **9:41 p.m.:** A third officer enters the room and begins talking to Loewe and McCarthy.

Time: **9:44 p.m.:** The third officer exits. McCarthy and Loewe disappear from view. Pyka then bends to the floor and does 2 push-ups and several stretching movements.

Time: **9:45 p.m.:** McCarthy and Loewe re-enter the picture. McCarthy then directs Pyka to stand and take the breathalyzer. This test takes approximately 4 minutes.

Time: **9:49:30 p.m.:** Pyka sits back down and McCarthy begins to advise him about bonding out. The words "bond" and "drivers license" can be discerned.

### (b) The Take–Down

The following chronological summary outlines the events leading up to and concluding with Officer McCarthy's take-down of Pyka

---

Court does not appreciate missing deposition pages that contain relevant and material information and finds that the failure, by both parties, to provide this information is unexcusable.

12. Ecchymosis is defined by Dr. Teas as a hemorrhage underneath the skin, with the skin surface intact that looks like a bruise. Teas.Dep. at 37.

and Officer Loewe's participation in that conduct.

Time: **9:50:16 p.m.:** Pyka is permitted to stand up and walk to the table where McCarthy is seated to make a phone call. Loewe is standing behind McCarthy.

Time: **9:50:29 p.m.:** Pyka begins to lift the receiver, turns toward McCarthy to listen, and then picks up the phone and dials. Initially, Pyka is facing north with his left side visible to the camera.

Time: **9:36 p.m.:** Loewe begins to walk around the table, away from Pyka.

Time: **9:50:38 p.m.:** Pyka then turns his back to the camera and faces the officers.

Time: **9:50:40 p.m.:** Loewe circles back and moves toward Pyka.

Time: **9:50:49 p.m.:** McCarthy stands and says loudly "shut up! shut up!" McCarthy then grabs the arm in which Pyka is holding the phone, Pyka moves backward, still holding the phone. Loewe moves forward to take the phone out of the arm McCarthy is holding and places it back on the receiver. At the same time, McCarthy turns Pyka around to face the camera, bends his neck back with his arm, struggles, twists Pyka around again and drags him toward the south end of the room where the bench is located.

Time: **9:51:10 p.m.:** McCarthy then holds Pyka in a chokehold in a bent over position. Loewe turns around and walks out of the room—apparently to lock up his gun.

Time: **9:51:20 p.m.:** Loewe returns from locking up gun and walks over to where McCarthy is restraining Pyka.

Time: **9:50:23 p.m.:** McCarthy puts Pyka face down on the floor, stands between his legs, puts his knee in his back and cuffs him. Loewe assists in the cuffing. The officers say a few words to Pyka, pick him up and lead him out of the lock-up into the cell block.

Time: **9:52 p.m.:** The three people disappear from view.

(c) Post–Take–Down Occurrences

The following chronological summary outlines the events that occurred after the takedown and after Pyka was led to his cell.

Time: **9:52:24 p.m.:** Several loud and angry voices can be heard saying "fuck" several times.

Time: **9:54:09 p.m.:** Two new officers enter the lockup. One officer walks immediately to the cell block from where Officers McCarthy and Loewe have not yet emerged. One officer checks his gun and walks into the cell block.

Time: **9:54:30–33 p.m.:** Loewe and the two new officers re-emerge.

Time: **9:54:34 p.m.:** McCarthy also re-emerges and walks directly toward Healy with his arm extended and his finger pointed. He then checks his walk and returns to the table.

Time: **9:54:34 p.m.:** Loewe re-enters the cell block at 9:54:34 p.m. and a loud "Fuck–You" can be heard.

Time: **9:54:48 p.m.:** Loewe then re-enters the lock-up and the four officers begin talking.

Time: **9:56:02 p.m.:** McCarthy directs Healy to stand, talks to him at the bench, and then directs Healy to leave.

Time: **9:57:04 p.m.:** Healy walks to the table, grabs his coat, puts it on and leaves with an unidentified officer.

Time: **9:58:20 p.m.:** McCarthy and Loewe return to the cell.

Time: **9:58:30 p.m.:** A third officer enters the cell block.

Time: **9:59:14 p.m.:** This third officer returns.

Time: **9:59:27 p.m.:** McCarthy and Loewe return from the cell area.

Time: **10:02:28 p.m.:** Loewe returns to the cell alone.

Time: **10:04:57 p.m.:** Loewe and McCarthy then converse while McCarthy does paperwork.

Time: **10:14:57 p.m.:** Loewe leaves the lock-up.

Time: **10:15 p.m.:** McCarthy cleans up and leaves the lock-up.

(d) Events At Time of Pyka's Death

Ironically, the audio—which is virtually un-discernible—stops at 11:18:14 p.m. The rest of the tape is a view of an empty lock-up area until 11:58:57 p.m., when Officer Hartsock enters the room and walks into the cell block. At 11:59:09 p.m., Officer Hartsock walks (not runs) back into the lock-up (in a very calm manner) and picks up the phone under the desk and makes a phone call. At 11:59:30 p.m., Hartsock hangs up the phone and walks back to the cell.

Then, a surprising event happens: at 11:59:45 p.m. the tape is cut and does not pick back up again until 12:04,51 p.m., when we see at least three officers milling about. Shortly thereafter, at 12:05:16 p.m., par-amedics enter with a stretcher from the door through which Pyka entered the station ap-proximately three hours earlier. The esti-mated time of Pyka's death was 11:58 p.m. Thus, during the six to seven minutes when Officer Hartsock is apparently "running back and forth" from the cell to the lock-up, the videotape is unreviewable—those minutes lost like Pyka.

## II. DISCUSSION

### A. Summary Judgment Standards

■ Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genu-ine issue for trial exists only when "the evi-dence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Materiality[13] is determined by as-sessing whether the fact in dispute, if proven, would satisfy a legal element under the theo-ry alleged or otherwise affect the outcome of the case. Id. 477 U.S. at 247, 106 S.Ct. at 2509. The Court must view all the evidence in the light most favorable to the nonmoving party, Valley Liquors, Inc. v. Renfield Im-

porters, Ltd., 822 F.2d 656, 659 (7th Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. Santiago v. Lane, 894 F.2d 218, 221 (7th Cir.1990). If the evidence, however, is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249–50, 106 S.Ct. at 2511; Matsushita Elec. Indus. Co. v. Ze-nith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538; Flip Side Pro-ductions, Inc. v. Jam Productions, Ltd., 843 F.2d 1024, 1032 (7th Cir.), cert. denied, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the court's sole function is to decide whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility deter-minations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for sum-mary judgment. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. at 2513.

### B. Analysis

■ "The first inquiry in any § 1983 suit" is "to isolate the precise constitutional viola-tion with which [the defendants] are charged." Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). Plaintiffs charge defendants with the following constitutional violations, alleg-ing that each violation was the proximate cause of Pyka's death by suicide:

1. Count I: *Fourth Amendment* claim against Officers McCarthy and Loewe in their individual capacity for *excessive use of force* during Pyka's arrest;

2. Count II: *Fourteenth Amendment* claim against Sgts. Doll and Slewoski and Officers McCarthy, Loewe, and Cavender in their individual capacities for *refusal of bail.*

3. Count III: *Fourth and Fourteenth Amendment* claim against Officers McCar-thy and Loewe in their individual capaci-

---

**13.** "The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the govern-ing law will properly preclude the entry of sum-mary judgment." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Factual disputes that are irrelevant or unnecessary are not material. *Id.*

ties for violating Pyka's *right to be free from summary punishment* before trial.

4. Count IV: *Fourth and Fourteenth Amendment* claim against Sgt. Doll and Officers McCarthy, Loewe, Duggan and Cavender, in their individual capacities for *deliberate indifference to Pyka's medical needs* and for deprivation of medical care and treatment.

5. Count V: *Fourteenth Amendment* claim against the Village of Orland Park for *failure to train* its police officers in suicide prevention and awareness.

6. Count VI: *Fourteenth Amendment* claim against the individual officers and the Village of Orland Park for deprivation of their rights to *continued society, association, relationship and companionship* with Pyka.

Once the constitutional violations are identified, the Court's threshold inquiry is whether the defendants are entitled to qualified immunity for their alleged conduct. The issue of qualified immunity is a threshold question in any summary judgment motion because "the purpose of an objective qualified immunity inquiry is to avoid unnecessary burdens on government officials by more frequent use of the summary judgment tool...." *Rakovich v. Wade*, 850 F.2d 1180, 1204 (7th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

The plaintiffs in this case seek to hold several of its police officers liable in their individual and official capacities for Pyka's death under 42 U.S.C. § 1983. To establish that a defendant is liable in his or her individual capacity under § 1983, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). To establish official-capacity liability, there must also be a policy or custom behind the deprivation. *Id.* The defendants do not dispute that they were acting under color of state law. They do contend, however, that Pyka was not deprived of any federal rights and that they are immune from suit in both their individual and official capacities.

The plaintiffs have not offered any evidence of a policy or custom behind the alleged deprivations of Pyka's constitutional rights. The defendants are therefore entitled to immunity in their official capacity on all counts. The question is whether the defendants are entitled to immunity in their individual capacity. We will begin with the legal standards relevant to that question and address the issue of qualified immunity, together with the merits, within the framework of each count, taken *seriatim.*

### 1. Count I: Excessive Force

#### (a) Qualified Immunity

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." A police officer's entitlement to qualified immunity is determined by an objective standard, *id.* 457 U.S. at 818, 102 S.Ct. at 2738, "like the 'reasonableness' component of the Fourth Amendment itself." *Gordon v. Degelmann*, 29 F.3d 295, 299 (7th Cir.1994). Thus, the central question is whether a reasonable police officer would believe that the challenged conduct was unlawful given the circumstances as they existed at the time of the alleged constitutional violation. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Misunderstandings of the law which result in an officer reasonably, but mistakenly, concluding that his or her actions are lawful does not bar immunity. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

The issue of qualified immunity is a pure question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 528 n. 9, 105 S.Ct. 2806, 2816 n. 9, 86 L.Ed.2d 411 (1985). *See also Green v. Carlson*, 826 F.2d 647, 651–52 (7th Cir.1987). When considering a qualified immunity claim on summary judgment, this legal determination is made by examining all

the undisputed evidence in the record, construed in the light most favorable to the non-movant. *Id.* The court need not nor should it resolve disputed questions of material fact. *Id.* Thus, immunity may be conferred on a defendant only if the undisputed facts establish that the defendant's conduct did not violate clearly established law. *Id.* "[I]f there are issues of disputed fact upon which the question of immunity turns, or if it is clear that the defendant's conduct did violate clearly established law, the case must proceed to trial." [14] *Id.* at 652; *Klein v. Ryan,* 847 F.2d 368, 371 (7th Cir.1988).

 The determination of whether an official is entitled to qualified immunity proceeds in two steps. The defendant must first show that he or she was acting within the scope of discretionary authority at the time of the alleged conduct. Once this is shown, the plaintiff must prove that the official's conduct violated clearly established law. The Seventh Circuit typically breaks this question down into two parts: (1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question? *See Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir. 1986); *Zorzi v. County of Putnam,* 30 F.3d 885, 892 (7th Cir.1994) (quoting *Rakovich v. Wade,* 850 F.2d 1180, 1210 (7th Cir.1988)); *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994).

In *Rakovich,* the Seventh Circuit framed the test as follows:

> Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law. It is the plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right. The factual circumstances of the alleged violation need not be 'identical' to prior

holdings in order to find an officer entitled to qualified immunity. Nonetheless, closely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established.

850 F.2d at 1204. *See also Estate of Starks v. Enyart,* 5 F.3d 230, 233 (7th Cir.1993) (unlawfulness of officer's action must be clear in light of pre-existing law); *Kernats,* 35 F.3d at 1176 (only analogous case needed, cases "on all fours" not required). In the alternative, a plaintiff may present "evidence that the defendant['s] conduct is patently violative of [a] constitutional right that reasonable officials would know without guidance from the courts." *Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir.1993) (citations omitted) (internal quotations and punctuation omitted).

In Count I, the allegedly unconstitutional conduct includes the following acts. The plaintiffs claim that Officers McCarthy and Loewe used excessive force by:

1) verbally abusing and threatening Pyka;

2) grabbing and striking Pyka;

3) choking and forcing Pyka to the floor;

4) dragging, pushing and forcing Pyka into a jail cell;

5) pushing, striking, and threatening Pyka while stripping Pyka of his clothes and other possessions.

(i) Scope of Discretionary Authority

 The first question is whether defendants have established that the alleged takedown by Officer McCarthy was within the scope of this officer's discretionary authority. To make this showing, Officer McCarthy "must demonstrate objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his [or her] authority." *Sweatt v. Bailey,* 876 F.Supp. 1571, 1576 (M.D.Ala.1995).

The evidence shows that the take-down did not involve "beating an arrestee," which is

---

**14.** We find this proposition incompatible with the standards governing Rule 56 motions for summary judgment, since a finding that the defendant violated clearly established constitutional rights, which is based on the undisputed facts for purposes of deciding the issue of qualified immunity, would also make a trial based on the merits of the underlying claim unnecessary.

clearly not within an officer's discretionary authority, but rather "controlling an arrestee," which is. Although the defendants have submitted no evidence on this issue, it is apparent to the Court that, as a general matter, police officers must perform the duty of controlling persons after arrest. *Id.* at 1576. In Officer McCarthy's opinion, Pyka needed to be controlled because he was screaming into the phone, refusing to follow his direction to quiet down, and attempting to strike or hit him with the phone. Given these beliefs, the Court finds that Officer McCarthy's use of force to control Pyka was within the scope of his discretionary authority. The duty to control arrestees, however, is still subject to the Fourth Amendment's prohibitions against the use of excessive and unnecessary force.

### (ii) Constitutional Violation

■ As outlined above, the Seventh Circuit divides the question of whether a clearly established constitutional right has been violated into two parts: (1) whether the right alleged was clearly established; and (2) whether the right alleged was violated by the conduct at issue. The determination of whether

> a plaintiff has asserted a constitutional violation at all is '[a] necessary concomitant to the determination of [qualified immunity].' Deciding as a threshold matter the 'purely legal question' of whether a plaintiff has established the violation of any constitutional right at all permits courts expeditiously to weed out suits which fail the test without requiring the defendant who rightly claims qualified immunity to engage in an expensive and time consuming preparation to defend the suit on its merits.

*Triad Associates, Inc. v. Robinson,* 10 F.3d 492, 496 (7th Cir.1993) (citing *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). If the alleged conduct does not establish a *prima facie* constitutional claim, then the alleged conduct cannot violate clearly established constitutional standards.

The "violation" aspect of the immunity question requires analysis of whether a reasonable police officer in the defendant's position could believe that his or her actions were lawful. *Anderson,* 483 U.S. at 640, 107 S.Ct.

at 3039; *Klein,* 847 F.2d at 374; *Green,* 826 F.2d at 652 n. 4. After careful review of the undisputed facts in this case, we believe that no reasonable officer in Officer McCarthy's position could believe that the force used during the take-down was lawful under the Fourth Amendment in light of the circumstances present at the time.

■ The Fourth Amendment guarantees citizens the right "to be secure in their persons ... against unreasonable seizures" of the person. U.S. Const.Amend. IV. "[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (citing *Tennessee v. Garner,* 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985)). As will be demonstrated below, the Fourth Amendment protects a person from the initial moment of seizure (the arrest) through the period of custody that culminates in a formal arraignment or probable cause hearing. After a formal charge is made, the arrestee becomes a pretrial detainee who is protected by the Fourteenth Amendment Due Process Clause.

Pyka was an arrestee protected by the Fourth Amendment at the time that Officer McCarthy grabbed him by the neck, held him in a chokehold and forced him to the floor. This "seizure" was part of the continuing seizure that began when Officer McCarthy cuffed Pyka, put him in the squad car and brought him to the police station. Consequently, the constitutionality of the take-down conduct is subject to the Fourth Amendment's "reasonableness" standard.

■ Reasonableness under the Fourth Amendment is judged by an objective standard. *Id.* 490 U.S. at 387, 109 S.Ct. at 1867. Alleged violations of the Fourth Amendment against police officers must therefore be assessed by asking "whether the officers' actions [were] 'objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* In making a reasonableness determination, the Court must balance the nature and quality of the intrusion on the individual's Fourth Amendment

**1218**

interests against the governmental interests at stake. *Id.* 490 U.S. at 396, 109 S.Ct. at 1871.

▉ In *Graham,* the Supreme Court acknowledged that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* 490 U.S. at 396, 109 S.Ct. at 1872. The Court must therefore look to the facts and circumstances of each case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is resisting arrest or attempting to flee. *Id.* A court must also adopt the "perspective of a reasonable officer on the scene [of the arrest]," and it must understand that " 'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . .' violates the Fourth Amendment." *Id.* 490 U.S. at 396, 109 S.Ct. at 1872 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

▉ The question whether a particular action is objectively reasonable, in light of the facts and circumstances confronting the defendant, is a question of fact rather than a question of law when "the court finds itself unable to discern a clear answer" to "the question whether or not particular conduct falls below the applicable standard required by the law—such as the reasonableness of the use of force in this case." *Roundtree v. City of New York,* 778 F.Supp. 614, 621 (E.D.N.Y.1991). It is the plaintiff's burden as the nonmoving party on a motion for summary judgment under Fed.R.Civ.P. 56 to offer sufficient evidence to raise this question. It is the defendant's burden, as the moving party, to demonstrate that no reasonable jury could find its conduct unreasonable given the material and undisputed facts. *See Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990) ("[t]he officer's use of force in pulling [plaintiff] from

the car and handcuffing him was reasonable under the circumstances, and no reasonable juror could find otherwise.").

After watching the videotape of Officer McCarthy's take-down and applying the objective reasonableness standard, this Court finds itself more than able to discern a clear answer to the question whether the particular conduct at issue falls below the applicable standard required by the law. Officer McCarthy's conduct clearly does fall below this standard because a reasonable police officer, in the defendant's position, would not believe that the amount of force used during the take-down was lawful under the Fourth Amendment.[15]

The videotape clearly shows that Pyka, almost docile throughout the entire booking procedure, was merely standing at a table making a phone call. Although it appears that Pyka may have started screaming into the phone at his mother (and may have made an offensive gesture in Officer Loewe's direction), there was no sign of physical aggression or violence by Pyka, despite testimony by Officers McCarthy and Loewe that Pyka raised the phone receiver back and away from his head like a weapon when McCarthy attempted to take it out of his hand. Rather than using the phone as a weapon against McCarthy, the videotape indicates that Pyka was merely trying to pull the phone away from McCarthy, who in turn was trying to grab it from him. However, even if Pyka was trying to hit McCarthy with the phone, McCarthy clearly had Pyka under control when Loewe took the receiver out of Pyka's hand and placed back on the hook. In fact, the phone was on the hook *before* McCarthy grabbed Pyka around the neck, twisted him in a 180 degree spin, dragged him across the floor and held him in a chokehold. This continuing use of force was clearly excessive given that any legitimate law enforcement reasons for the initial physical restraint of Pyka vanished once the phone was taken out of Pyka's hand and Pyka ceased struggling in resistance to the re-

---

**15.** The Court understands that it must not use hindsight in evaluating Officer McCarthy's actions. Yet, this Court's initial reaction after viewing Officer McCarthy's actions on videotape was that we were witnessing an unambiguous constitutional violation of Christian Pyka's rights. This initial reaction has remained steadfast during repeated viewings of the videotape and, if anything, serves to confirm the Court's initial view.

straint. The Court therefore finds that the plaintiffs have alleged a cognizable constitutional violation in Count I.

### (iii) Clearly Established Law

For this Fourth Amendment right to be "clearly established,"

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (citation omitted).

On November 8, 1991, the most recent case issued in the Seventh Circuit held that the Fourth Amendment reasonableness standard governed all acts of force against a person held in custody from the time of the initial seizure until the time of conviction. *See Titran v. Ackman,* 893 F.2d 145, 147 (7th Cir.1990). *See also Stewart v. Roe,* 776 F.Supp. 1304, 1306 (N.D.Ill.1991) (following *Titran* in an excessive force case). *Cf. Wilkins v. May,* 872 F.2d 190 (7th Cir.1989) (applying a Fourteenth Amendment substantive due process deliberate indifference standard to acts of force against pretrial detainees). In *Titran,* the court found that excessive force was essentially the same as punishment and therefore prohibited by the constitution. The Court found, however, that the Fourth Amendment reasonableness standard, rather than the Fourteenth Amendment Due Process Clause, applies to claims of excessive force by pretrial detainees because the Seventh Circuit had effectively eliminated the substantive due process rationale adopted in *Wilkins.* *Compare Gumz v. Morrissette,* 772 F.2d 1395 (7th Cir.1985) *with Lester v. City of Chicago,* 830 F.2d 706, 713 n. 7 (7th Cir.1987); *Williams v. Boles,* 841 F.2d 181, 183 (7th Cir.1988). Thus, at

the time of Pyka's death, a police officer's use of force upon a person held in custody prior to trial was a clearly established constitutional violation if this force could be characterized as an unreasonable "punishment." *Id.* This Court finds, based on the undisputed facts in this case, that Officer McCarthy's use of force during the take-down was objectively unreasonable, as a matter of law. Officer McCarthy is therefore stripped of his immunity for civil damages in his individual capacity in the event that he is found liable for a violation of the Fourth Amendment.

### (b) A Split of Authority

Although we could stop here for purposes of deciding the question of immunity, the merits of this case ultimately require a more in-depth analysis of whether the Fourth or the Fourteenth Amendment protects a person held in custody after an initial seizure but before a formal arraignment or probable cause hearing. There is a serious split of authority in the circuits on this issue and unexplainable ambiguity in the Seventh Circuit. We address this split in the context of the immunity question, not for purposes of determining which law was clearly established at the time of the alleged violation—that much is clear—but because this Court's determination of Count I on the merits depends upon our resolution of this question. We therefore proceed to that analysis.[16]

### (i) The Circuit Court Decisions

In *Graham v. Connor,* the Supreme Court stated: "Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today." 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10. This open question has generated a split of authority in the circuit courts and an ambiguous position in the Seventh

---

16. In this section of the opinion, we will attempt to outline the split of authority on this issue and explain why we find the Seventh Circuit cases ambiguous, at best. We will also address the emerging sentiment that the Fourth Amendment does not simply govern excessive force claims,

per se, but also claims involving the treatment of arrestees during the seizure and the conditions of confinement prior to a formal arraignment or *Gerstein* probable cause hearing in cases where there has been a warrantless arrest.

Circuit. The question is dispositive in this case.

The majority of circuits addressing this question have concluded that the Fourth Amendment protects a suspect from the point of the first seizure or arrest until pretrial detention begins. The determination of when pretrial detention begins, therefore, is critical. According to the majority of circuit courts, pretrial detention begins when a suspect is arraigned or formally charged and ends when the suspect is acquitted or convicted. *See Powell v. Gardner,* 891 F.2d 1039, 1044 (2d Cir.1989) (Fourth Amendment standard should be applied at least to the period prior to arraignment or formal charge and while suspect remains in custody (sole or joint) of the arresting officer); *Hammer v. Gross,* 884 F.2d 1200, 1204 (9th Cir.1989) (where DUI arrestee forced to submit to blood test, district court held that Fourth Amendment standard applies to use of force during course of arrest and includes acts immediately after the moment of the initial seizure; district court questioned whether Fourth Amendment controls when seizure or arrest ripens into detention), *vacated en banc on other grounds,* 932 F.2d 842, 845 n. 1 (9th Cir.1991) (noting agreement with application of Fourth Amendment), *cert. denied,* 502 U.S. 980, 112 S.Ct. 582, 116 L.Ed.2d 607 (1991); *Austin v. Hamilton,* 945 F.2d 1155, 1159–60, 1162 (10th Cir.1991) (Fourth Amendment reasonableness standard applies to claims of excessive force during "post-arrest," "second custodial stage," or "pre-hearing" context), *abrogated on other grounds by Johnson v. Jones,* — U.S. —, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (on issue of collateral appeal); *Pride v. Does,* 997 F.2d 712, 716 (10th Cir.1993) (applying Fourth Amendment standard to claim of excessive force brought by arrestee who was handcuffed, taken to the highway patrol office and restrained by the officer's application of force to his neck). *See also United States v. Myers,* 972 F.2d 1566, 1571–72 (11th Cir.1992), *cert. denied,* 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993) (upholding a Fourth Amendment jury instruction in a post-arrest, pre-charge excessive force case). *But see Brown v. Doe,* 2 F.3d 1236, 1240 (2d Cir.) (finding that pretrial detainee beaten while in custody was protected by Fourteenth Amendment Due Process Clause without considering issue of Fourth Amendment protection or distinguishing and reversing *Powell* ), *cert. denied,* — U.S. —, 114 S.Ct. 1088, 127 L.Ed.2d 403 (1993).

(ii) The District Court Decisions

There are also several well-reasoned district court decisions on this point. *See e.g., Sweatt,* 876 F.Supp. at 1576 (district court applied Fourth Amendment to arrestee who claimed excessive use of force when officer beat him while he was talking on the telephone); *Gonzalez v. Tilmer,* 775 F.Supp. 256, 262 (N.D.Ill.1991) (applying Fourth Amendment to claim of mistreatment—not receiving any food—during post-arrest pre-charge period); *Freece v. Young,* 756 F.Supp. 699, 700 (W.D.N.Y.1991) (following *Powell* court held that plaintiff's denial of medical treatment claim must be judged under Fourth Amendment objective reasonableness standard); *Henson v. Thezan,* 717 F.Supp. 1330 (N.D.Ill. 1989) (in widely recognized post-*Graham* case, court applied Fourth Amendment to claim that police officers beat him in squad car and interrogation room after his arrest but before a formal *Gerstein* hearing); *Jones v. County of DuPage,* 700 F.Supp. 965, 967– 72 (N.D.Ill.1988) (pre-*Graham* and pre-*Wilkins* decision that raised question whether Fourth Amendment applied to claims of excessive use of force by those in custody during period before *Gerstein* hearing in cases of warrantless arrest). *But see Reed v. City of Chicago,* 867 F.Supp. 714, 718 (N.D.Ill. 1994) (Norgle, J.) (rejecting application of Fourth Amendment to claim of unlawful confinement and detention and following *Wilkins* ); *Jones v. Thompson,* 818 F.Supp. 1263, 1267 (S.D.Ind.1993) ("It is clear that between arrest and trial a detainee is entitled to the protection of the Fourteenth Amendment"); *Edwards v. May,* 718 F.Supp. 1379, 1382 (N.D.Ill.1989) (Norgle, J.) (following *Wilkins* district court held that Seventh Circuit has "rejected use of the Fourth Amendment to determine the limits of permissible police conduct" for claims of excessive force during the "post-arrest pre-charge" stage). Two of these cases warrant further discussion.

In *Sweatt v. Bailey*, 876 F.Supp. 1571 (M.D.Ala.1995), police officers arrested the plaintiff for driving under the influence of alcohol and took him to the police station for booking. The defendant officers contended that the plaintiff became uncooperative and threatening. The officers admitted that they then "forcibly placed [the plaintiff] in a chair." The plaintiff, however, claimed that while he was on the phone, he called one of the officers an "ass." One of the officers then hit him several times on the head and cursed at him. The other officer allegedly just stood by and watched during this altercation. The district court found that the officers did not have qualified immunity for their conduct because the use of excessive force in the Eleventh Circuit is prohibited by both the Fourth and Fourteenth Amendments. *Id.* at 1580. The district court then found, after canvassing the circuits on this issue, that "on balance, the circuit courts are following the implication of *Graham* that fourth amendment protection against excessive force continues to apply after the moment of arrest and, ... at least to the booking procedure if not longer." *Id.* at 1581. The court further found that this expansive interpretation of the Fourth Amendment's scope was continued in the Supreme Court's recent case, *Albright v. Oliver*, —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality), especially in Justice Ginsburg's concurrence. Nonetheless, the court did not decide the issue but instead allowed both the Fourth and the Fourteenth Amendment claims to proceed, despite its acknowledgement that *Graham* found that the application of the Fourth Amendment precluded the use of a substantive due process analysis. 490 U.S. at 395, 109 S.Ct. at 1871.

In *Henson v. Thezan*, 717 F.Supp. 1330 (N.D.Ill.1989), the plaintiff was arrested in his Uncle's home on suspicion of home invasion, rape, child molestation and attempted murder. After handcuffing the plaintiff, one of the officers pushed the plaintiff down a flight of stairs, causing him to land on his face. Once in the squad car, this same officer began beating the plaintiff in the face, demanding a confession. When the other officer present warned the officer beating the plaintiff not to leave marks, the latter shifted his attack to the plaintiff's body. During the drive to the police station, this same officer threatened to shoot the plaintiff's "black ass dead" if he did not speak. The plaintiff refused. At the station, the officers placed the plaintiff in an interrogation room where, over the course of the next few hours, three officers took turns beating the plaintiff into confession. The plaintiff ultimately confessed, but only after losing the toenails on his feet and suffering injuries to the groin, his back and to his emotional well-being. *Id.* at 1331.

In *Henson*, the district court, familiar with the issue of whether the Fourth or the Fourteenth Amendment applied to claims of excessive force after arrest but before formal charge, *see Jones*, 700 F.Supp. at 970–971, found that the Supreme Court's decision to leave this question open in *Graham* permitted the court to once again hold that the Fourth Amendment's reasonableness standard, rather than the Fourteenth Amendment's substantive due process analysis, applied to the facts of that case. Most of the district court's opinion attempted to show why *Wilkins*, issued one month before *Graham*, was inconsistent with the decision in *Graham* and therefore of questionable authority. The key to the *Henson* rationale, and the one this court believes is ultimately persuasive, is as follows:

> *Graham*, ... does call into question *Wilkins*'s analysis regarding the termination of a first seizure. In *Wilkins*, it will be remembered, Judge Posner drew a line between seizure and detention by holding that a seizure ends when the police have the individual "securely in custody." Yet, the fact that the officers in *Graham* had the plaintiff securely in their custody well before the incident ended, *see* 490 U.S. at 390, 109 S.Ct. at 1868, did not prevent the Supreme Court from applying the Fourth Amendment reasonableness standard to the entire incident.

In other words, *Graham* and *Wilkins* agree that the Fourth Amendment applies until the initial seizure comes to an end, but *Graham* seems to hold, contrary to *Wilkins*, that when the police beat an individual senseless after gaining control over

(initially seizing) him, the Fourth Amendment still can provide the appropriate framework for assessing the lawfulness of their conduct. *Graham* thus appears to undercut *Wilkins'* view that seizure ends at the moment the police gain custody and control over the suspect.

If the seizure does not end then, then when does it end? Without its "custody" rationale, *Wilkins* leaves us with a holding that a seizure is over by the time custodial interrogation begins, but no principled basis for reaching this result. *Id.* at 1334–35.

#### (iii) The Suicide Cases

These cases stand in stark contrast to a number of district court cases in this circuit and beyond involving pre-charge detainee suicides ("suicide cases"). In the suicide cases, courts typically do not mention the Fourth Amendment cases outlined above. *But see Jones,* 700 F.Supp. at 970–71. Instead, in the majority of suicide cases, courts have strictly applied the Fourteenth Amendment Due Process Clause by reasoning that the arrestee was "in custody" and therefore "detained."

Under the Fourteenth Amendment Due Process Clause "deliberate indifference," rather than the Fourth Amendment's reasonableness standard, governs. In cases where the detainee commits suicide, courts have generally held that the deliberate indifference standard was met only when a defendant's knowledge regarding a detainee's prior suicidal tendency was established. *See Hall v. Ryan,* 957 F.2d 402, 403 (7th Cir. 1992) (genuine issue of fact existed as to whether "the defendants actually knew that Howard was a serious suicide risk, based not only on Howard's behavior that day but also on Howard's past encounters with the Decatur police department"); *Bragado v. City of Zion/Police Department,* 788 F.Supp. 366 (N.D.Ill.1992) (city's motion for summary judgment denied were "there [was] substantial evidence that Bragado suffered from psychological problems of which the Zion police were aware,...."); *Bragado v. City of Zion/Police Department,* 839 F.Supp. 551, 554 (N.D.Ill.1993) (jury verdict upheld despite fact that jail had an audio and visual monitoring system because jury could have reasonably concluded that system was not adequate to protect Bragado and regulations required police to make periodic personal inspections of the cell which were not done).

Similarly, in other cases, the mere existence of a suicidal past was not enough to prove deliberate indifference where none of the correctional officers had actual knowledge of the detainee's suicidal history. *See Smith v. City of Joliet,* No. 90 C 5522, 1993 WL 18981 at *1 (N.D.Ill. Jan. 28, 1993); *Hinkfuss v. Shawano County,* 772 F.Supp. 1104, 1114 (E.D.Wis.1991). Moreover, where the detainee had no known prior history of suicidal tendencies, as in this case, it was even harder to show that the officers had knowledge that the detainee might take his own life. *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.1983) ("knowing that [the detainee] was behaving violently, or was acting in a 'freaky' manner is not synonymous with having reason to know that the violence might become self-directed.").

Further, in *Camic,* the Seventh Circuit was influenced by the fact that the police did take some precautions against suicide by removing the detainee's belt and shoelaces. Therefore, the defendants in *Camic* were not deliberately indifferent to the possibility that the detainee might take his own life, even if they failed to follow all of the jail's procedures regarding the monitoring of prisoners, such as checking the cells every hour.

The *Camic* decision has been relied on heavily by other district courts in this circuit to determine what constitutes deliberate indifference to the risk of suicide by a pretrial detainee. *See Smith,* 1993 WL 18981, at * 5 (detainee's "uncooperative, sometimes freaky manner" was not enough to alert the officers that he might attempt suicide); *Brooks v. City of Chicago,* No. 88 C 8609, 1992 WL 373034, at * 4 (N.D.Ill. Dec. 8, 1992) (fact that detainee was belligerent and intoxicated "is not synonymous with having reason to know that he was suicidal"). In this case, like *Smith,* there is simply no evidence that the defendants had any subjective knowledge that Christian Pyka would commit suicide while detained alone in his cell. Pyka did not

have a prior history of suicidal ideation, nor had he ever threatened to hurt himself before the night he died, during the course of the night he was taken into custody or while he was in the presence of the defendants. Moreover, Pyka had never been arrested before, nor is there any evidence that the Orland Park police had ever had any dealings with Pyka before the night he died. The fact that detainee Padin heard Pyka threaten to kill himself is not material without evidence that Padin either informed an officer of this fact or that an officer overheard this conversation.

The *Camic* decision would control the Court's analysis in this case, if it were not for an important distinguishing factor, namely, the fact that *Camic* did not address the *Graham* question but assumed, without explanation or citation, that the person arrested was a pretrial detainee protected by the Fourteenth rather than the Fourth Amendment at the time of the suicide. Although the *Graham* issue has been assumed, rather than raised, in this case too, this Court cannot blindly apply a Fourteenth Amendment due process standard—simply because others have done so—given our understanding of the authority that applies a Fourth Amendment reasonableness standard to conduct that occurs after the initial arrest but before a formal charge or probable cause hearing.

### (iv) Seventh Circuit Law

The state of Seventh Circuit law regarding this issue, however, is ambiguous. One month before *Graham* issued, the Seventh Circuit held in *Wilkins*, 872 F.2d at 194, that the Fifth and Fourteenth Amendment Due Process Clause protects a suspect once the arrest or "first seizure" is complete until conviction. In other words, pre- and post-charge detention is covered by the Fifth and Fourteenth Amendment Due Process Clause not the Fourth Amendment. Conversely, approximately one year after *Graham,* the Seventh Circuit held that the Fourth Amendment applies to all claims arising from the time of arrest until conviction. *Titran,* 893 F.2d at 147. The court in *Titran,* however, cited *Wilkins* with approval—apparently for the proposition that the arrest ends at the point where the booking process is complete, *i.e.,* where the "administrative steps incident to arrest" are over. *See Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). Pretrial detention, according to the *Titran* decision, begins there—not ending until the trial is over.

*Titran's* application of a Fourth Amendment reasonableness standard to the period of detention after the initial arrest really muddies the waters. *See Stewart,* 776 F.Supp. at 1306 (N.D.Ill.1991) (noting that Seventh Circuit has sent mixed signals on issue of whether Fourth or Fourteenth Amendment applies to period immediately after arrest but before a formal charge but following *Titran* and applying a Fourth Amendment standard to claim of excessive force by arrestee beaten while in holding cell). Although *Titran* and *Wilkins* speak with one voice about where to draw the line between arrest and detention, they argue for the application of entirely different constitutional standards. Neither case, in this Court's view, is consistent with the Supreme Court's decisions in *Graham* and *Bell,* nor with each other.[17]

---

**17.** *Wilkins* is inconsistent with *Graham* because *Wilkins* held that a seizure ends when the police have the individual "securely in custody." Custody, however, was not the determining factor in *Graham.* Although the officers in *Graham* had the plaintiff securely in their custody well before the incident ended, this fact did not prevent the Supreme Court from applying the Fourth Amendment reasonableness standard to the entire incident. *Henson,* 717 F.Supp. at 1334–35. Thus, although "*Graham* and *Wilkins* agree that the Fourth Amendment applies until the initial seizure comes to an end," *Graham* holds, "contrary to *Wilkins,* that when the police beat an individual senseless after gaining control over (initially seizing) him, the Fourth Amendment

still can provide the appropriate framework for assessing the lawfulness of their conduct." *Id.* at 1335. "Without its 'custody' rationale, *Wilkins* leaves us with a holding that a seizure is over by the time custodial interrogation begins, but no principled basis for reaching this result." *Id.* *Graham* did not draw a line between arrest and detention at "custody," but purposely left that line undrawn and the constitutional standard to be applied in the absence of that line unclear.

*Wilkins* is inconsistent with *Titran* because it applies a Fourteenth Amendment substantive due process rather than the Fourth Amendment reasonableness standard to the post-arrest precharge period. This substantive due process standard, however, first acknowledged in a case

This apparent conflict has led the Court to search the Seventh Circuit decisions issued since *Graham* was decided to determine the state of the law. Several district court decisions follow *Wilkins*. *See e.g., Reed v. City of Chicago,* 867 F.Supp. 714, 718 (N.D.Ill. 1994) (Norgle, J.) (rejecting application of Fourth Amendment to claim of unlawful confinement and detention and following *Wilkins*); *Jones,* 818 F.Supp. at 1267 ("It is clear that between arrest and trial a detainee is entitled to the protection of the Fourteenth Amendment"); *Edwards v. May,* 718 F.Supp. 1379, 1382 (N.D.Ill.1989) (Norgle, J.) (following *Wilkins* district court held that Seventh Circuit has "rejected use of the Fourth Amendment to determine the limits of permissible police conduct for claims of excessive force during the "post-arrest precharge" stage). And one district court decision follows *Titran*. *See Stewart,* 776 F.Supp. at 1306–07. The Seventh Circuit has not expressly followed either decision. *Cf. Salazar v. City of Chicago,* 940 F.2d 233, 238 (7th Cir.1991) (where the Court assumed (without deciding) that pre-charge detainees were protected by the Fourteenth Amendment rather than the Fourth Amendment); *Kinney v. Indiana Youth Center,* 950 F.2d 462, 465 (7th Cir.1991) ("in between arrest and conviction, the due process clause applies to preclude the use of force that amounts to punishment"), *cert. denied,* 504 U.S. 959, 112 S.Ct. 2313, 119 L.Ed.2d 232 (1992); *Brownell v. Figel,* 950 F.2d 1285 (7th Cir.1991) (same).

In *Garcia v. City of Chicago,* 24 F.3d 966 (7th Cir.1994), however, Judge Cudahy's concurring opinion is instructive. The concurring opinion states:

[T]his circuit has a line of cases stating that after a *Gerstein* hearing, the Fourth Amendment ceases to apply and due process furnishes the only standard. *Wilkins v. May,* 872 F.2d 190 (7th Cir.1989), *cert. denied,* 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990); *Villanova v. Abrams,* 972 F.2d 792, 797 (7th Cir.1992).... the Supreme Court's recent decision in *Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), potentially blurs the bright line we have drawn.... Justice Ginsburg, who joined the plurality, wrote separately to explain her reasons for considering the case under the Fourth Amendment:

Albright may have feared that courts would narrowly define the Fourth Amendment's key term 'seizure' so as to deny full scope to his claim. In particular, he may have anticipated a holding that the 'seizure' of his person ended when he was released from custody on bond.... Such a concern might have stemmed from Seventh Circuit precedent set before *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *See Wilkins v. May,* 872 F.2d 190, 195 (1989) (substantive due process 'shock the conscience' standard,

---

captioned *Gumz v. Morrissette,* 772 F.2d 1395 (7th Cir.1985), was in the process of being "whittled down to nothing" by cases in the Seventh Circuit at the time *Wilkins* was issued, *see Lester v. City of Chicago,* 830 F.2d 706, 713 n. 7 (7th Cir.1987); *Williams v. Boles,* 841 F.2d 181, 183 (7th Cir.1988), and called "redundant" of the Eighth Amendment protections by the Supreme Court in *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989). Judge Easterbrook therefore found that *Gumz* was "without continuing force," the implication being that the basis for *Wilkins* was also without continuing force. 893 F.2d at 148.

*Titran,* on the other hand, although issued after *Graham,* totally ignores the *Graham* question, *i.e.,* does the Fourth Amendment continue to provide individuals with protection against the deliberate use of force beyond the point at which arrest ends and pretrial detention begins. Instead, in *Titran,* Judge Easterbrook reframes the question as does the Fourth Amendment apply

during pretrial detention, *i.e.,* the period between an "arrest and conviction." *Titran,* 893 F.2d at 147. This reframing, in turn, ignores the decision in *Bell,* which held that the Fourteenth Amendment Due Process Clause applies to claims arising during pretrial detention. *Titran* must be called into question by *Bell v. Wolfish,* 441 U.S. 520, 535–39, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979), decided many years before, which expressly held that pretrial detention is governed by the Fourteenth Amendment Due Process Clause. If *Titran,* really stands for the proposition that detention begins immediately after the "first seizure" (a determination not all that easy to make in cases where there has not been a formal pronouncement of arrest with the necessary recitation of rights) then *Bell v. Wolfish* requires application of the Fourteenth Amendment rather than the Fourth Amendment. *Titran,* therefore, is of questionable authority. *But see id.*

not the Fourth Amendment, applies to brutal 'post arrest pre-charge' interrogation).

*Id.* —— U.S. at —— & n. 2, 114 S.Ct. at 815 & n. 2. The Ginsburg opinion further observes that the Fourth Amendment continues to apply even after an initial bond hearing and release on custody, since the defendant remains " 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." *Id.* —— U.S. —— at ——, 114 S.Ct. at 816.

*Id.* at 975.

Rejecting Justice Ginsburg's statements as "dicta in an otherwise narrow substantive due process case," Judge Cudahy nonetheless goes on to make his own revolutionary pronouncement that "the Fourth Amendment's prohibition against 'unreasonable' seizures is coextensive with the Fourteenth Amendment's prohibition against deprivations of liberty without due process." *Id.* (citing Justice Blackmun's dissent in *Albright* as his only source of authority for that statement).

The *Garcia* concurrence is instructive because it implies that, in the Seventh Circuit, the Fourth Amendment has always applied to conduct occurring after arrest and *before* the *Gerstein* hearing. *Id.* (citing *Wilkins* and *Villanova*). We have already observed that *Wilkins* does not specifically draw a "bright line" at the *Gerstein* hearing. *Id.* Rather, in *Wilkins* Judge Posner drew the line for Fourth Amendment protection at the end of the "first seizure." In *Villanova*, however, Judge Posner retreats from *Wilkins* and finds that "the Fourth Amendment governs the period of confinement between [warrantless] arrest ... and the preliminary [*Gerstein*] hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause." *Villanova*, 972 F.2d at 797. According to *Villanova*, it will be important for district courts to ask first whether a person was arrested pursuant to a warrant, and if not, whether this person has been formally charged at a preliminary hearing. *Id.* The constitutional standard to be applied to conduct occurring

during this period depends upon the answers to those questions.

The majority of circuit courts appear to be resolving the question in favor of applying the Fourth rather than the Fourteenth Amendment to conduct that occurs after the initial seizure or arrest but before a formal hearing before a neutral judicial official. In the absence of any clearer authority from the Seventh Circuit to the contrary, and after careful consideration of the facts in this case, the Court finds that the defendants' conduct on the night Pyka died should be judged by a Fourth Amendment reasonableness standard. Pyka was never formally charged nor was he brought before a neutral judicial officer for a probable cause determination (*i.e.*, the arrest, assuming it was supported by probable cause, was still warrantless). Thus, this Court will apply a Fourth Amendment reasonableness standard in this case for the simple reason that Pyka was protected by the Fourth Amendment under the clearly established law in this circuit on the night of his death. *See Titran*, 893 F.2d at 147–48.

#### (c) The Merits

#### (i) Officer McCarthy

██ Having determined that the Fourth Amendment reasonableness standard applies to Officer McCarthy's use of force to takedown Pyka, the remaining question is whether this finding effectively requires the Court to enter summary judgment for the plaintiff on the underlying Fourth Amendment claim. The Seventh Circuit has held that "if it is clear that the defendant's conduct did violate clearly established norms, the case must proceed to trial." *Green*, 826 F.2d at 652. This statement makes sense only in light of the legal fiction that the qualified immunity question and the merits of the underlying claim are "conceptually distinct," *Mitchell*, 472 U.S. at 527–28, 105 S.Ct. at 2816. In this case, our finding that the force used was clearly excessive for purposes of denying qualified immunity, easily leads us to conclude that the force used by Officer McCarthy was also a substantive violation of the Fourth Amendment for purposes of deciding the merits of Count I. However, since the question of reasonableness, although governed by an objective standard, is disputed in this case, we

must submit the issue of excessive force to the trier of fact.

The Court finds that the issue of reasonableness in this case cannot be decided as a matter of law, because "reasonable minds could differ" on the issue of whether the force used was excessive. For instance, a reasonable juror may conclude from watching the videotape that Pyka attempted to use the phone receiver as a weapon before Officer McCarthy engaged in the take-down. Further, as indicated in the factual summary of this opinion, there are conflicting versions of what happened prior to and during that incident.

Although this Court has grave doubts about the reasonableness of the force displayed on the videotape, we simply believe that the most prudent course is to allow the trier of fact to judge the objective reasonableness of Officer McCarthy's conduct on November 8, 1991. Thus, although qualified immunity is denied to the defendants based on the legal determination that Officer McCarthy's take-down conduct was objectively unreasonable, the disputed questions of fact regarding the objective reasonableness of this conduct, for purposes of deciding liability and damages, will proceed to a determination on the merits by the trier of fact.

### (ii) Officer Loewe

The preceding discussion only resolves the issue of whether Officer McCarthy is potentially liable in his individual capacity for a Fourth Amendment violation. We have found for purposes of qualified immunity that he is. The Court must still, however, determine whether Officer Loewe is entitled to qualified immunity and potentially liable for a Fourth Amendment violation. This determination is made more difficult because the Amended Complaint is poorly pled. For example, plaintiff's counsel has failed to recognize that while the facts do not support a finding that Officer Loewe used excessive force against Pyka, the facts do support a failure to intervene claim, a theory that has not been pled at all.

 In *Yang v. Hardin,* 37 F.3d 282 (7th Cir.1994), the Seventh Circuit held that "[o]missions as well as actions may violate civil rights." *Id.* at 285. In particular, "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Id.* It is well-established in this circuit that "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know ... that excessive force was being used, ... *and* the officer had a realistic opportunity to intervene and prevent the harm from occurring." *Id.* (citing cases) (emphasis in original).

 In this case, the videotape clearly shows that Officer Loewe not only had a realistic opportunity to intervene—and thus prevent the continued restraint of Pyka after the phone was removed from his hand—but Officer Loewe also had "reason to know" that the force used to restrain Pyka exceeded the amount necessary to simply restrain him, take the phone out of his hand and prevent either the disruption that arose from the phone conversation or the possibility that Pyka was going to hit Officer McCarthy with the phone receiver. Officer Loewe was in clear view of the event, helped Officer McCarthy take the phone out of Pyka's hand, and then turned his back and walked out of the room while Officer McCarthy continued to hold Pyka around the neck, drag him across the floor and hold him down. Although it appears that Officer Loewe was removing his gun from his holster and checking it at the door before approaching Pyka and McCarthy, it is not clear why Officer Loewe felt it was necessary to walk out of the room at that particular moment. Any danger from being in the lock-up with a loaded gun and two uncuffed detainees was present before the take-down began. Thus, the decision to check his gun (if that is what he was doing) at the moment that Officer McCarthy was restraining Pyka, raises the inference that Officer Loewe simply did not want to stand by and watch or intervene to prevent the continued restraint.

The immunity question is whether this "failure to intervene" was objectively reasonable under the circumstances. The Court has already held that a reasonable officer in

Officer McCarthy's position would not believe that the force used to restrain Pyka was reasonable under the circumstances. Officer Loewe is not entitled to a more lenient standard. His omission also must be judged by whether a reasonable officer in Officer Loewe's position would have intervened to prevent the take-down. There is some evidence, by Lyle Healy in fact, that Officer Loewe said, as he hung up the phone and as McCarthy began choking Pyka: "Great! His mom was on the phone, now she probably thinks we're killing the kid." At most this statement raises an inference that Loewe was trying to warn Officer McCarthy of something. This evidence, however, is not only disputed but also insufficient to confer immunity.

The Court finds that a reasonable officer in these circumstances would have said more or done more to prevent the continued restraint. A reasonable officer, unlike Officer Loewe, would not have walked out of the room at the precise moment that Officer McCarthy began choking Pyka around the neck and dragging him across the floor simply because Pyka may have been screaming and making offensive gestures moments earlier. The Court therefore finds that Officer Loewe is not entitled to qualified immunity.

■ Like the excessive force claim against Officer McCarthy, however, we find that the underlying Fourth Amendment claim against Officer Loewe, characterized by this Court as a "failure to intervene" rather than an excessive force claim,[18] raises genuine issues of material fact that must be resolved by the trier of fact. These material issues are: (1) whether Officer Loewe had a reasonable basis for believing that the force used by Officer McCarthy was unreasonable under the circumstances; and (2) whether Officer Loewe was acting an objectively reasonable manner when he turned his back and walked out of the room during the take-down. We will therefore submit this issue to the jury.

To summarize, the Court has found that the Fourth Amendment reasonableness standard applies to the defendants' conduct alleged in Count I. Officer McCarthy is denied qualified immunity for his take-down of Pyka and Officer Loewe is denied immunity for his failure to intervene and therefore prevent the take-down. The denial of immunity is based on the Court's review of the undisputed facts and the videotape. This review has led us to conclude that a reasonable officer, reviewing the same evidence, would find that Officer McCarthy's use of force was excessive and that Officer Loewe's failure to intervene was objectively unreasonable under the circumstances. The merits of the Fourth Amendment violations alleged in Count I, however, must be decided by the trier of fact because genuine issues of material fact exist with respect to whether the defendants' conduct was objectively reasonable.

### 2. Count II: Refusal of Bail

■ In Count II, the plaintiffs allege that Sgts. Doll and Slewoski together with Officers McCarthy, Loewe and Cavender did not process Pyka for bail in a timely fashion or allow Pyka's bail to be posted in a timely fashion, despite at least two telephone calls— one from Pyka's friend Todd Sherman and one from Pyka's father, Richard Pyka—before 11:58 p.m., the estimated time of Pyka's death. The defendants are entitled to qualified immunity on this count because the right to make bail, unlike the right to be free from excessive force, is not a constitutional right, and even if it is, it was not clearly established on November 8, 1991.

The "right to bail" has never been established as a fundamental constitutional right under federal law. The United States Supreme Court refused to decide the issue in 1982. *See Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam) (in dicta Court found that Eighth Amendment prohibition against excessive

18. Although plaintiffs have not pled a failure to intervene claim in their First Amended Complaint, the Court has concluded that the record supports such a claim that must be decided by the trier of fact on the merits. The plaintiffs are

therefore ordered to file a Second Amended Complaint alleging a failure to intervene by Officer Loewe in Count I within fourteen (14) days from the date of this opinion.

force implies a right to bail in certain circumstances but held that petitioner had been convicted of offense so right to pretrial bail was moot). In 1987, the Court again addressed the issue of whether the Eighth Amendment, through the Fourteenth, provides a "right to bail" for pretrial detainees, but did not decide that question, finding only that the portion of the Bail Reform Act of 1984 that allows Congress to place limits on the availability of bail for arrestees charged with serious felonies who are detained prior to trial is constitutional. *United States v. Salerno,* 481 U.S. 739, 752–755, 107 S.Ct. 2095, 2104–06, 95 L.Ed.2d 697 (1987). *See generally Augustus v. Roemer,* 771 F.Supp. 1458, 1463 (E.D.La.1991) (for a thorough discussion of the issue).

The Seventh Circuit has not decided the question either. In *Faheem–El v. Klincar,* 841 F.2d 712, 717–19 (7th Cir.1988), the Seventh Circuit discussed the issue but did not decide the question of whether the Eighth Amendment, through the Fourteenth, provides a fundamental right to bail for arrestees charged with non-capital crimes who are detained prior to trial. Instead, the Seventh Circuit decided the narrow question of whether parolees arrested on new criminal charges are entitled to bail pending the outcome of their final parole revocation hearing. The Court held that Illinois' failure to provide parolees with a bail hearing conducted by a judicial officer when they are arrested on new bailable criminal charges does not violate the Eighth Amendment, the Due Process or the Equal Protection Clause. *Id.* at 729.

Regardless of whether a separate cause of action can be brought when a police officer refuses to allow a detainee to make bail, the constitutional right to bail was not clearly established on the night of Pyka's death. The absence of an express judicial finding that a fundamental right to bail exists, in the Eighth Amendment or elsewhere, requires this Court to grant the defendants qualified immunity for the conduct alleged in Count II. Summary judgment will therefore be granted in favor of defendants on this count.

*3. Count III: Punishment*

In Count III, the plaintiffs allege that Officers McCarthy and Loewe violated Pyka's Fourth and Fourteenth Amendment rights to be free from pre-trial detention constituting punishment. In particular, plaintiff's claim that the autopsy of Pyka's body reveals multiple abrasions and bruises that reflect the infliction of corporal punishment by means of pushing, grabbing, striking, choking, and restraining Pyka.

The Court has held that the Fourth rather than the Fourteenth Amendment governs the actions taken by the defendants while Pyka was in their custody. Under the Fourth Amendment, the acts of violence alleged in Count III must be judged by an objective reasonableness standard. After a review of the record, we find that the defendants are entitled to qualified immunity for some of the conduct alleged to be unconstitutional in Count III.

First, the take-down conduct alleged in Count I subsumes the grabbing and choking conduct alleged in Count III, and is duplicative. We therefore will not address that conduct under Count III. The next issue is whether the allegations of pushing Pyka and restraining him in handcuffs violates the Fourth Amendment. The Supreme Court has held that " 'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ...' violates the Fourth Amendment." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872 (citing *Johnson,* 481 F.2d at 1033). The Court finds that the allegations of pushing are underdeveloped and cannot constitute the basis for a cognizable constitutional violation because there is no evidence from which the court could conclude that a reasonable officer would believe that this conduct, if it occurred, was unlawful. Defendants are therefore entitled to immunity for the pushing allegations.

There is also not enough evidence to support a constitutional claim based on the alleged verbal abuse, threats and the removal of some (or all) of Pyka's clothing when he

was in the cell.[19] Again, the plaintiffs' counsel simply did not develop the record in a way that would permit the Court to find that this conduct violated the Fourth Amendment. The defendants are therefore entitled to qualified immunity for this conduct, as a matter of law, because no reasonable officer in the defendants' circumstances would believe that mere pushing, heated words and the removal of clothes (to prevent a suicide) would be unlawful conduct given the circumstances present on the night of Pyka's death.

■■■ The striking allegations, however, have more merit. For example, some of the abrasions and bruises on Pyka's body are unexplainable given the disputed facts in this case.[20] In particular, the following injuries cannot be explained by the accident, the chokehold; the grabbing during the take-down, the handcuffs, or the wounds that would be present from the noose:

1) the "pinpoint area of abrasion on the left side of the forehead;

2) multiple abrasions on the right flank;

3) multiple small areas of petechiae on the right and left buttocks;

4) multiple small areas of ecchymosis on the anterior aspect of the right thigh;

5) Two parallel areas of superficial abrasion with an area of one inch between them just below the abrasions on the right thigh;

6) a linear area of superficial abrasion just above the right knee;

7) a superficial abrasion on the anterior aspect of the right shin;

8) a superficial abrasion on the medial aspect of the right foot;

9) an abrasion on the anterior aspect of the left shin; and

10) an area of ecchymosis on the dorsal aspect of the left foot.

*See* Teas Dep. at 36. With respect to these injuries, Dr. Teas stated that the abrasion to Pyka's forehead was a recent injury and that the abrasions to the legs would have been caused by a blunt injury," for instance from a blow or a bump into a table. *See id.* at 52. Dr. Teas could not confirm the source of these injuries. *Id.* at 54.

The unexplainable nature of these injuries is highlighted by the fact that almost everyone deposed states that Pyka did not have any injuries after the car accident. This evidence leads us to conclude that the injuries were inflicted sometime after the Fourth Amendment seizure took place. Mere pushing, however, would not cause these abrasions and bruises unless Pyka was pushed against something, like a table or a bed. The abrasion on Pyka's forehead and the bruises to Pyka's legs are also not easily explainable. Although it is true that the take-down involved a brief struggle between Pyka and Officer McCarthy which resulted in Pyka's forehead being put against the floor during the cuffing, Pyka was never pushed against the table or hit with a blunt object. The videotape will show that the restraint imposed by Officer McCarthy, although excessive, would not have resulted in a "blunt injury" of the type found on Pyka's body after his death. At most, there might be bruises around his neck where Officer McCarthy choked him.

The unexplainable nature of these injuries raises a genuine issue of material fact because there is some evidence that Pyka was beaten or assaulted in some other way inside his cell. For instance, plaintiffs offer testimony by Healy who stated that he heard Pyka yell "hit me again cop!" following "slapping" noises. The defendants offer testimo-

---

**19.** We note that there are disputed issues of fact with respect to whether all or some of Pyka's clothes were removed in the cell. However, without more discovery on these facts and without some legal theory other than a vague assertion of "punishment" these facts are not material and therefore do not provide the basis for the assertion of a Fourth Amendment violation.

**20.** Some of the injuries, however, are explainable. For instance, steel handcuffs would explain

the bruises around Pyka's wrists, since it is reasonable to assume that Pyka tried to move his wrists while in the cuffs. Similarly, the bruises around Pyka's neck are explainable given the fact that he hung himself from the bars of his cell with his t-shirt. Even the coroner testified that these injuries were consistent with that type of trauma. Because these injuries do not raise genuine issues of material fact, they will not be the subject of a trial on the merits.

ny by Officers McCarthy and Loewe who deny hitting, slapping or beating Pyka. The defendants also offer a statement by detainee Padin who stated that when Pyka was led to the cell he was pushed but not beaten. Healy's testimony controverts defendants' offers of proof and creates a genuine issue of material fact with respect to the issue of whether Pyka was, in fact, "punished" while he was in the cell with Officers McCarthy and Loewe in violation of the Fourth Amendment. Unlike the take-down incident, there is no means for determining this question as a matter of law since there is no video or what happened inside the cell. Qualified immunity is therefore denied with respect to the "striking" allegations as they relate to the allegations of injury documented by the coroner.

These allegations, however, must also be reviewed by the trier of fact to determine whether they are sufficient to support a Fourth Amendment violation against Officers McCarthy and Loewe in their individual capacity. Summary Judgment will therefore be denied on Count III only as to the "striking" allegations and the evidentiary basis for these allegations.

### 4. Count IV: Failure To Provide Medical Care

 In Count IV, plaintiffs allege that Sgt. Doll, together with Officers McCarthy, Loewe, Duggan, Cavender are liable for failure to provide Pyka with necessary medical care while he was in their custody. In particular, plaintiffs allege that Officers McCarthy and Loewe ignored Pyka's agitation and mood changes which fit the profile of a potential suicide risk. Officers Duggan, Cavender and Sgt. Doll, on the other hand, are charged with the failure to perform lifesaving CPR when they found Pyka hanging. These failures, claim plaintiffs, were also the proximate cause of Pyka's death.

The defendants are entitled to qualified immunity on Count IV for the allegations related to their failure to provide necessary medical care and the contention that this failure was the proximate cause of Pyka's death. The entitlement to immunity stems from the fact that the defendants' alleged failures to provide CPR and to recognize

Pyka's suicidal tendencies are not constitutional violations, let alone violations of clearly established constitutional rights, unless there is some evidence that the defendants were deliberately indifferent to Pyka's medical needs. *See Hall,* 957 F.2d at 404 (citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Although the right to receive needed medical care while in custody was established under both the Fourth and Fourteenth Amendments at the time of Pyka's death, *id.,* there is no evidence that the defendants were either aware or should have been aware, under the circumstances presented to them, that Pyka was a suicide risk, or that Pyka was in need of CPR at the time they discovered his body. Pyka never made any threat to kill himself, nor did the defendants ever receive the suicide awareness training that might have alerted them that Pyka was potentially suicidal. Moreover, when the defendants found Pyka, they checked his pulse and determined that he was dead. Given that the defendants did not have a duty to perform CPR upon a body under state or local rules, we conclude that the defendants' belief that CPR was unnecessary was reasonable under the circumstances presented to them. Although Lt. Smith, the paramedic, testified that he believed Pyka was in cardiac arrest at the time he arrived, there is no evidence that the defendants would have known this information. Additionally, there is no evidence that CPR would have been effective, since the record shows that Lt. Smith's attempts at CPR failed to revive Pyka. The Court therefore finds that the defendants are entitled to qualified immunity for Count IV. Summary judgment is therefore denied.

### 5. Count V: Municipal Liability

Plaintiffs also argue that the Village of Orland Park should be held liable for Pyka's suicide because it failed to train its police officers with respect to suicide detection or prevention. This claim against the Village is based on the theory that this training would have alerted the officers to the six or seven "symptoms" of suicidal tendencies described by plaintiffs' expert, allowing the officers to take measures to prevent the suicide.

The Supreme Court has held that inadequate police training may support a § 1983 claim. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). However, the circumstances under which municipal liability will attach to a failure to train case are fairly limited: "the inadequacy of police training may serve as the basis for a § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*

A two prong inquiry must be made to determine if a failure to train claim is sufficient. First, it must be determined whether the failure to train constitutes a city policy which is the result of a "deliberate" or "conscious" choice made by a municipality. *Id.* 489 U.S. at 389, 109 S.Ct. at 1205. Second, there must be a direct causal link between the failure to train and the constitutional injury. *Id.* 489 U.S. at 391, 109 S.Ct. at 1206.

In *Smith v. City of Joliet,* Judge Plunkett made a thorough analysis of a failure to train claim in response to a motion to reconsider. No. 90 C 5522, 1993 WL 106814, at *2 (N.D.Ill. April 7, 1993). *See also Smith v. City of Joliet,* 1993 WL 18981 at *6–8 (granting motion for summary judgment). Judge Plunkett held that "the need for specialized training was not so obvious that the city's failure to procure it for its officers constitutes deliberate indifference." *Smith,* 1993 WL 106814, at *2. He was persuaded by the fact that there had been only two previous suicide attempts at the jail over a course of many years and also by the fact that the officers did routinely take some precautions against suicides, such as removing shoelaces and belts at the completion of booking procedures and placing individuals who were feared to be suicidal in front cells. *Id.* Judge Plunkett also determined that the plaintiff had failed to prove causation, because, even if the officers had determined, as a result of training, that the deceased was a high suicide risk, it was unclear that the officers would have acted any differently. *Id.* at *2–3.

In *Hinkfuss v. Shawano County,* the plaintiff alleged that the county had a policy of deliberate indifference to the right of detainees to medical attention, which was evidenced in the officers' lack of medical training. *Hinkfuss v. Shawano County,* 772 F.Supp. 1104, 1112 (E.D.Wis.1991). The court found that the detainee did not seem to be in need of immediate medical attention, so the facts of the case failed to show that the jailers were deliberately indifferent to the detainee's needs or that the county had an established policy of deliberate indifference to medical needs.

In this case, there is no evidence that the Village had a large suicide problem (despite Sgt. Doll's testimony that he had seen about 10 suicides prior to Pyka's, since there is no evidence that those 10 suicides occurred at Orland Park) that they were deliberately ignoring. Moreover, there were no statutes or municipal regulations requiring the officers to perform CPR or to take suicide awareness classes. Thus, the officers' failure to perform CPR and recognize that Pyka would commit suicide before it happened are not a basis for liability against the Village for failure to train and do not amount to an unconstitutional policy under *Canton.* Summary judgment will therefore be granted on Count V in favor of the defendants.

*6. Proximate Cause*

In Count VI, the plaintiffs allege that the defendants' conduct, as pled in Counts I–V, was the proximate cause of Pyka's suicide. Proximate cause, as defined in the Illinois Jury Pattern Instructions, is: "any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." IPJI (Civil) § 15.01.

In *Jones v. County of DuPage,* 700 F.Supp. 965 (N.D.Ill.1988), the district court found that "[i]f the defendants' negligent acts violated some other constitutional provision, and if this misconduct proximately caused plaintiff to commit suicide, then the defen-

dants will be liable for his death." *Id.* at 969 (citing *Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir.1988), and *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1359 (7th Cir.1985)). According to *Jones,* if the plaintiffs can prove that the defendants' unconstitutional conduct proximately caused Pyka to commit suicide, then the defendants will be liable for his death.

The allegedly unconstitutional conduct that could serve as a basis for a proximate cause finding in this case includes the take-down conduct by Officer McCarthy, together with Officer Loewe's failure to intervene. We have already indicated that there is a strong probability that the take-down by Officer McCarthy and the failure to intervene by Officer Loewe violated Pyka's Fourth Amendment right to be free from the excessive use of force. If the trier of fact comes to the same conclusion that this Court has reached, then the trier may also find that this conduct was a proximate cause of Pyka's suicide. This determination, however, as all proximate cause determinations are, is a factual determination reserved for the trier of fact. We will therefore submit this issue for trial. In addition, the disputed evidence of striking and slapping conduct, although tenuous evidence, may also—if it is found to violate the Fourth Amendment—provide a basis for a proximate cause finding. This issue, therefore, will also be submitted to the jury.

The real question is whether there is sufficient evidence to establish that these violations, if proven, were the proximate cause of Pyka's suicide. Detainee Padin's testimony is crucial to the plaintiffs' case in this regard. Detainee Padin's testimony is that Pyka feared for his life, and, in one instance, said to the officer that came into his cell to take off his belt, shoes and "something else": "Why don't you just kill me and get it over with?" After the officer left, Pyka then apparently said to Padin something like "why didn't he just make it easy for the police, and kill himself." Pls.' Ex. B. Although Padin's testimony is subject to a credibility assessment by the jury, this testimony, together with the videotape showing the take-down, failure to intervene, and subsequent actions

or non-actions of the police officers certainly raises a reasonable inference that Pyka was afraid due to the physical force used on him that night by Officer McCarthy. A reasonable jury could conclude that this fear, triggered by the excessive use of force during the take-down, could have been the proximate cause of Pyka's suicide. However, that determination, of course, is a question of fact reserved for the trier of fact since this court merely sits to determine whether there is a sufficient factual basis to support such a finding. We find that such a basis exists and therefore will submit this issue to the jury. Summary judgment is therefore denied on Count VI.

*7. Motion for Judgment on The Pleadings*

Rule 12(c) provides the standard to be applied on a motion for judgment on the pleadings:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by rule 56.

Fed.R.Civ.P. 12(c).

 A Rule 12(c) motion may be submitted after the close of the pleadings to raise various Rule 12(b) defenses regarding procedural defects. *See Alexander v. City of Chicago,* 994 F.2d 333, 335 (7th Cir.1993). Accordingly, a motion for judgment on the pleadings is subject to the same standards as a Rule 12(b)(6) motion to dismiss. *Id.* *See also United States v. Wood,* 925 F.2d 1580, 1581 (7th Cir.1991). All well-pleaded facts are taken as true, all inferences are drawn in favor of the plaintiff and all ambiguities are resolved in favor of the plaintiff. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992). "A motion for judgment on the pleadings may be granted only if the moving party clearly establishes that no material is-

sue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law." *National Fidelity Life Ins. Co. v. Karaganis,* 811 F.2d 357, 358 (7th Cir.1987).

 In their motion for judgment on the pleadings, the defendants argue that the plaintiffs' untitled claim for survivorship (Count VI), should be dismissed pursuant to Rule 12(c) because this case is brought by Pyka's parents for damages on behalf of Danielle Pyka, Christian Pyka's sister, in her individual capacity. Defendants argue that the Seventh Circuit does not permit siblings to recover in § 1983 cases for loss of society and companionship, *Bell v. City of Milwaukee,* 746 F.2d 1205, 1247 (7th Cir.1984), and therefore Danielle Pyka, as Pyka's sibling, has no standing to recover in this case.[21] *See also McBride v. Lindsay,* 718 F.Supp. 24, 26 (N.D.Ill.1989) (applying *Bell* to an Illinois case). We agree and therefore grant defendants' motion for judgment on the pleadings as to Danielle.

## III. CONCLUSION

For the reasons given in this opinion, the individual defendants are entitled to qualified immunity for the conduct alleged in Counts II (refusal of bail) and IV (failure to provide medical care). Defendants' Motion for Summary Judgment on Counts II and IV is therefore granted. In addition, the Village of Orland Park is not liable for the conduct alleged in Count V (municipal liability), and defendants' Motion for Summary Judgment as to that count is also granted. The Clerk of the Court is therefore directed to enter judgment in favor of the defendants and against the plaintiffs on Counts II, IV and V. Defendants' Motion for Judgment on the Pleadings as to Count VI against Danielle Pyka is also granted, and the Clerk of the Court is further directed to enter judgment in favor of the defendants and against Danielle as to Count VI.[22]

Defendants' Motion for Summary Judgment on Counts I (excessive force), III (punishment), and VI (proximate cause), however, is denied. The Court's review has demonstrated that genuine issues of material fact exist regarding whether Christian Pyka's Fourth Amendment right to be free from the use of excessive force was violated by Officer McCarthy's take-down conduct; Officer Loewe's failure to intervene to prevent the take-down; and the "striking" allegations pled against the two officers in Counts I and III. These issues will be submitted to the trier of fact because Officers McCarthy and Loewe are not entitled to qualified immunity, as a matter of law.

The plaintiffs are directed to file a Second Amended Complaint alleging a failure to intervene theory of relief against Officer Loewe in Count I within fourteen (14) days from the date of this order.

---

**21.** Defendants acknowledge that Danielle Pyka is permitted to bring a state based claim for loss of society under Illinois law, but note that Judge Andersen previously granted the defendants' motion to dismiss all state-based claims alleged in the original complaint because such claims were barred by the applicable statute of limitations.

**22.** The Court previously entered a minute order denying this motion as moot. The Court hereby vacates that order and enters judgment in defendants' favor as to Danielle on Count VI.